In the Matter of SLEWETT & FARBER, Respondents-Appellants v BOARD OF ASSESSORS OF THE COUNTY OF NASSAU et al., Appellants-Respondents. ATTORNEY-GENERAL OF THE STATE OF NEW YORK, Intervenor-Appellant-Respondent.

Second Department, April 8, 1981

**APPEARANCES OF COUNSEL**

*Edward G. McCabe, County Attorney (Joshua A. Elkin* of counsel), for appellants-respondents.

*Koeppel, Sommer, Lesnick & Martone, P. C. (Bernard Sommer, Adolph Koeppel, Irving I. Lesnick, Tracie P. Peddy* and *Ann Del Casino* of counsel), for respondents-appellants.

*Robert Abrams, Attorney-General (John M. Farrar, Robert Schonfeld* and *George D. Zuckerman* of counsel; *Beth Turtz* on the brief), intervenor-appellant-respondent *pro se.*

*Allen G. Schwartz, Corporation Counsel (Edith I. Spivack, Reed G. Schneider* and *Jay M. Herman* of counsel), for the City of New York, *amicus curiae.*

*Bleakley Schmidt, P. C. (Frederick J. Martin* and *Hugh D. Fyfe* of counsel), for Rego Properties Corp. and another, *amici curiae.*

### OPINION OF THE COURT

LAZER, J. P.

At issue on these cross appeals are the validity and effect of a series of legislative enactments which retroactively altered the means by which aggrieved taxpayers could establish inequality of assessed valuations of real property. The underlying controversy involves the rates at which

real property in Nassau County was assessed for the years 1965/66 through 1977/78; the appellate questions pertain, however, to the constitutionality of laws which would nullify petitioners' judicial success in establishing those rates as identical to the equalization rates fixed for Nassau County by the State Board of Equalization and Assessment.

The petitioners, who own a large commercial parcel, have instituted proceedings to review its assessment, alleging that for the years in issue their property was assessed at a higher ratio to fair market value than other property in the county. In moving for partial summary judgment fixing the ratio to fair market value at which property in Nassau County was assessed for those years, the petitioners relied upon the rates established in the case of *860 Executive Towers v Board of Assessors of County of Nassau* (84 Misc 2d 525, affd 53 AD2d 463, affd *sub nom. Matter of Pierre Pellaton Apts. v Board of Assessors of County of Nassau*, 43 NY2d 769, on the opn at the Appellate Division) for tax years 1965/66 through 1973/74—which for the years 1970/71 through 1973/74 clearly were based upon the State equalization ratios—and upon the applicable equalization rates for the remaining years under review. In February, 1978, when the motion was made, the use of equalization rates to prove ratio of assessment was provided for in subdivision 3 of section 720 of the Real Property Tax Law. Special Term granted petitioners' motion (97 Misc 2d 637) and fixed each year's ratio at the percentage reflected in *860* for the earlier years and the appropriate equalization rates for the years following those decided in *860*. The county now asserts that if collateral estoppel principles bind it to the same equalization rates for the same years, thousands of other pending inequality proceedings will be affected—with attendant fiscal impact. In any event, following Special Term's order, the 1978 and 1979 Legislatures adopted a series of statutory amendments intended to limit the methods of proving inequality, both prospectively and retroactively. Since it is the constitutionality of this legislation which is in principal issue on these appeals, the Attorney-General has intervened to defend the enactments

and the City of New York has obtained *amicus curiae* status for the same purpose. Rego Properties Corp. and the Citizens Tax Council, Inc. have been granted *amicus curiae* status to support petitioners' claims of unconstitutionality. Under the circumstances, the legislative and judicial history leading to the current dispute comprise a vital backdrop to its resolution.

## The Inequality Concept and its Proof

In an inequality case, it is the taxpayer's contention that property in the taxing district generally is assessed at less than its full value for tax purposes and that the parcel under review has been assessed at full value or at a greater percentage of its full value than properties in the district generally *(People ex rel. Yaras v Kinnaw,* 303 NY 224). "For example, a specific claim might be that a subject property was assessed at 35% of its full value while other properties on the roll were assessed at only 30% of full value. If true, the petitioning taxpayer would be paying more than his due share of the aggregate tax" *(860 Executive Towers v Board of Assessors of County of Nassau,* 53 AD2d 463, 466 [HOPKINS, J.], *supra).* To succeed, therefore, the taxpayer must prove not only the ratio at which property in the tax district generally has been assessed, but that his own parcel was assessed at a higher ratio.

Under former section 293 of the Tax Law (L 1909, ch 62, as amd), the predecessor of the currently pertinent Real Property Tax Law provisions, the mandated method of proof compelled the petitioner and the assessing authorities to establish ratio by selecting a number of parcels from the assessment roll and proving their full value at trial. Once full value was determined, the total of the assessed values of the properties selected would be divided by the total of their full value to obtain the actual over-all ratio of assessed value to true market value in the taxing district (see *People ex rel. Hagy v Lewis,* 280 NY 184). Disagreement as to which parcels were to be used was resolved by the trial court's selection of an equal number from each list submitted by the parties. Either litigant

could supplement the select parcel system by offering evidence of the assessment ratio of parcels actually sold within the district during the periods under review.

In 1949, the State Board of Equalization and Assessment (SBEA) was created (see L 1949, ch 346) to establish the true ratios at which property was being assessed in all taxing districts and thus to equalize tax burdens between districts which were assessed at differing proportions to true value. The established rates also served to provide a basis for the distribution of State aid based on the assessed valuations (see L 1949, ch 346, § 1). Under relevant sections of the Real Property Tax Law, the SBEA is required to establish equalization rates for each city, town and village (Real Property Tax Law, § 1202; see, also, Real Property Tax Law, § 1250 *et seq.*), as well as for each county in the State (Real Property Tax Law, § 1214), and to sample the ratio of assessments in all cities, towns and villages in the State at least once every five years (Real Property Tax Law, § 1200). The rates themselves are arrived at by examination of sales and other data from the assessing units and the application of various formulae to the information obtained. In 1951 an effort to broaden the type of evidence admissible in an inequality trial by permitting the introduction of equalization rates was rejected in *People ex rel. Yaras v Kinnaw* (303 NY 224, *supra*). The *Yaras* court (p 228) decided that as far as inequality litigation was concerned, equalization rates "not only were entitled to no weight at all, but in truth were inadmissible under section 293 of the Tax Law." Although the court concluded that use of such rates would be misleading since they did not purport to reflect the ratio of assessments to value within the tax district itself, it noted (p 233) that evidence of actual sales was entitled to "substantial weight" in proving inequality. The advent of scientifically devised random sampling ultimately became the basis for the introduction of actual sales by use of statistical methodology with potential probative value (see *Matter of Mid-Island Shopping Plaza v Podeyn*, 25 Misc 2d 972, affd 14 AD2d 571, affd 10 NY2d 966) if properly utilized (cf. *Matter of Tilsac Corp. v Assessor of Town of Huntington*, 55 Misc 2d 431, affd 41 AD2d 604, mot for lv

to app den 32 NY2d 611). Nevertheless, as late as 1955, the select parcel method was still considered probative by the Court of Appeals, particularly if the sample parcels represented a fair cross section of the situation in the tax district (see *Matter of Wolf v Assessors of Town of Hanover*, 308 NY 416).

In 1961 the Legislature attempted to liberalize the means of proving inequality by amending subdivision 3 of section 720 of the Real Property Tax Law (the successor to Tax Law, former § 293) to permit either party to introduce the State equalization rate established for the assessment roll for the year under review (see L 1961, ch 942). The Court of Appeals remained unimpressed, however, and in *Matter of O'Brien v Assessor of Town of Mamaroneck* (20 NY2d 587) rejected a taxpayer's effort to rely exclusively on the equalization rate for his proof. Concluding that the 1961 amendment had rendered equalization rates admissible but had not endowed them with probative value, the court noted (pp 596, 597) that State equalization rates served an entirely different function from "litigated inequality," were arrived at "by processes quite foreign to those employed in judicial determinations," and "may have little relationship to the actual equality or inequality in a district".

Eight more years were to elapse before a further effort to legitimize the probative value of equalization rates succeeded. In 1969 subdivision 3 of section 720 of the Real Property Tax Law again was amended (see L 1969, ch 302) by eliminating the mandatory requirement for resort to the selected parcel system, thereby providing inequality petitioners with parcel selection, actual sales and equalization rates as permissible methods of proof. The litigation which ensued resulted in nothing short of a sea change, for in *Guth Realty v Gingold* (34 NY2d 440, 450), the Court of Appeals not only held that inequality could be established by means of the State equalization rate without resort to the other methods, but granted the rate a high degree of sanctification by characterizing its probative value as "objectively arrived at" and as tending "to greatly simplify and narrow the scope of these proceedings." Parcel selection and proof of actual sales were sharply criti-

cized (pp 449-450) as "not only [creating] discouraging and enormous expense for the taxpayer, but [promoting] the search by both sides for samples which are at the extreme ends of the spectrum—the same egregious problem we seem always to find in expert valuation testimony in condemnation cases."

Despite the shattering effect of this criticism upon parcel selection and proof of sales, *Guth (supra,* p 451) did not preclude assessing authorities from challenging the SBEA methodology for the purpose of demonstrating the inappropriateness of the equalization rate to the particular taxing unit, the category of property involved, the particular property under review, or for "any other valid reason". But even these limited avenues of escape for assessing authorities were largely shut in *860 Executive Towers v Board of Assessors of County of Nassau* (53 AD2d 463, affd *sub nom. Matter of Pierre Pellaton Apts. v Board of Assessors of County of Nassau,* 43 NY2d 769, *supra)* when this court determined that issues relating to the SBEA's methodology and the appropriateness of the equalization rate to a particular taxing unit were matters for administrative determination (see Real Property Tax Law, § 1204 *et seq.)* and CPLR article 78 review (see Real Property Tax Law, § 760) and therefore trials of those issues were of "severely limited scope" in tax certiorari proceedings (p 474). Furthermore, collateral estoppel was available to prevent relitigation of these issues if they had been disposed of in earlier proceedings. As we then declared (p 475) : "The County had proposed to litigate the inequality issue *de novo* in these proceedings, challenging the SBEA methodology all over again. Special Term invoked the doctrine of collateral estoppel against the County, precluding it from relitigating the issue as to the applicability of the State equalization rates. Its determinations should be affirmed."

The scope of the problem confronting the various taxing districts was expanded and complicated by the almost contemporaneous holding in *Matter of Hellerstein v Assessor of Town of Islip* (37 NY2d 1) which overthrew the venerable (see, e.g., *People ex rel. Board of Supervisors*

of *Westchester County v Fowler*, 55 NY 252; *Van Rens-selaer v Witbeck*, 7 NY 517; *People ex rel. Congress Hall v Ouderkirk*, 120 App Div 650; *People ex rel. Sheldon v Fraser*, 74 Hun 282, affd 145 NY 593), if illegal (see, e.g., Real Property Tax Law, § 306; L 1933, ch 470, § 18; L 1909, ch 62; L 1896, ch 908, § 21; 1 Rev Stat [1829], part I, ch XIII, art 2, § 17; L 1823, ch 262, § V; L 1801, ch 179, § 1; L 1788, ch 65) practice of assessing real property at a fraction of its full market value. Although the *Hellerstein* court made its mandate prospective only and granted the Town of Islip reasonable time to reassess at full value with an outside date of July 1, 1978 (see 39 NY2d 920), the predicament in that locale was duplicated in many taxing districts in the State. The prospect of eradicating in a single reassessment all the assessment disparities which have arisen in an era of frenzied real estate development and inflation profoundly shook public authorities and helped lead to legislative action.

### The Legislative Response—1977 and 1978

The 1977 Legislature enacted in three-bill package (see L 1977, chs 888, 889 and 890) which established a temporary committee to review the real property tax system and to make such recommendations to assure equitable distribution of the tax burden (L 1977, ch 889, § 3), extended the effective date of the *Hellerstein* decision to December 31, 1980 for any assessing unit which commenced a good faith reassessment on or after the 1976 taxable status date and was actually carrying out that revaluation (L 1977, ch 888, § 1; see, also, L 1980, ch 880 [extending the *Hellerstein* moratorium to May 15, 1981]), and again amended subdivision 3 of section 720 of the Real Property Tax Law (L 1977, ch 888, § 2; L 1977, ch 890). The latter amendment provided that introduction of the State equalization rate could be supplemented by information "with particular reference to the information developed by the state board with respect to the ratio of assessments to market values for each major type of taxable real property".

After the effective date of the 1977 enactments and

shortly after the Court of Appeals had affirmed this court's order in *860 (supra)* petitioners moved: (1) to consolidate all their tax review proceedings from tax years 1965/66 through 1977/78; (2) for partial summary judgment on the issue of ratio from 1965/66 through 1973/74 on the basis of the ratios found in *860*, and from 1974/75 through 1977/78 on the basis of the SBEA rate promulgated for the County of Nassau; (3) in the alternative for partial summary judgment on the ratios for 1974/75 through 1977/78 as established by the then-pending ratio trial in a case entitled *Georgian Web Offset Co. v Board of Assessors of County of Nassau* (Supreme Ct, Nassau County, MEADE, J.); and (4) that the ratios applicable in all other tax review proceedings brought by the more than 2,000 other petitioners represented by petitioners' counsel be those established on the instant motion.

On July 5, 1978, Special Term granted the motion to the extent of consolidating the proceedings and granting partial summary judgment on the ratio issue on the basis of the rates fixed in *860 (supra)* for the earlier years under review and the equalization rates for the later years. The court's rationale was predicated in great degree on the principles established in *860* which barred the county from relitigating the appropriateness of the State rate. Special Term rejected the county's contention that the 1977 amendment to subdivision 3 of section 720 of the Real Property Tax Law limited proof of inequality to a comparison with the same type of property, concluding that the amendment was merely declaratory of the existing practice of admitting computer printouts of SBEA data into evidence.

The Legislature responded quickly. On July 11, 1978 it created section 307 of the Real Property Tax Law and again amended subdivision 3 of section 720 (see L 1978, ch 476). Section 307 was comprised of five subdivisions, the first two of which reiterated the extension of the effective date of the *Hellerstein* mandate, while the last three changed the pleading requirements in inequality litigation. Subdivision 3 required every petition alleging inequality to assert that the assessment was made at a higher proportionate valuation than that of other property *of the*

*same major type* "as determined" by the SBEA and authorized the admission of additional evidence to establish this; subdivision 4 authorized petitioners in pending proceedings to amend their petitions accordingly; and subdivision 5 made the section retroactively effective by applying it to all pending proceedings. Originally intended to expire on December 31, 1980, the provisions of section 307 were subsequently extended to May 15, 1981 (L 1980, ch 880, § 3). The amendment to subdivision 3 of section 720 deleted the reference to the introduction of supplementary SBEA data and returned the subdivision to its pre-1977 wording. The legislative intent of the amendments was stated to be remedial and to correct "imperfections" in the 1977 legislation (L 1978, ch 476, § 3).

Shortly after the 1978 legislation became effective, the county moved for renewal and reargument of petitioners' summary judgment motion, arguing that the enactment of section 307 of the Real Property Tax Law (requiring that class inequality be pleaded) "clearly indicates that the position taken by respondents, on the original motion, was the true intention of the legislature." By the statute's own terms, declared the county, section 307 was applicable to all pending proceedings and therefore to the one at bar. Although Special Term denied reargument, it granted renewal and held (97 Misc 2d 637) that the last three subdivisions of section 307, authorizing assessment of different classes of property at different fractions of value, were unconstitutional because (1) the lack of guidelines by which the SBEA could establish the various classes of property resulted in an illegal delegation of legislative power, and (2) the fact that the power vested in local assessors to vary the fraction of true value at which the classes were to be taxed would result in property of the same class being assessed at varying percentages in contiguous districts in violation of the due process and equal protection clauses of the Fourteenth Amendment. The court also concluded that the amendment violated due process and equal protection precepts insofar as it was unreasonably retroactive and designed to divest taxpayers who instituted review proceedings of their refund remedy (see *Matter of Slewett & Farber v Board of Assessors of*

*County of Nassau*, 97 Misc 2d 637). The county's only solace was in the further holding that it was exempt from complying with *Hellerstein* (37 NY2d 1, *supra)* until the end of 1980.

### The 1979 Legislation

Although the current appeals are from the order relating to the 1978 legislation, the parties ask us to take notice of the fact that the 1979 Legislature again addressed the inequality issue by further amendment to subdivision 3 of section 720 of the Real Property Tax Law and the enactment of section 721 (see L 1979, chs 126, 127), and they further request that we pass upon the validity of this legislation. As originally enacted (see L 1979, chs 126, 127), both chapters of the 1979 legislation provided that their provisions were to expire on December 31, 1980. At its November 19, 1980 extraordinary session, the Legislature extended the expiration date of section 307 to May 15, 1981, but it took no similar action to extend the life of chapters 126 and 127, and the statutes expired at the end of 1980. In January of 1981, however, the Legislature again enacted a bill "deemed to be in full force and effect on and after" December 31, 1980 which extended the expiration dates of chapters 126 and 127 of the Laws of 1979 to May 15, 1981 (see L 1981, ch 3). Since the 1979 statutes have thus been extended, we are bound to consider the effect of that legislation on the instant appeals under the established principle that an appellate forum must decide the matter before it on the basis of the law as it stands at the time of appeal (see, e.g., *United States v Schooner Peggy*, 1 Cranch [5 US] 103 [MARSHALL, Ch. J.]; *Gallewski v Hentz & Co.*, 301 NY 164; *Gilpin v Mutual Life Ins. Co. of N.Y.*, 299 NY 253; *Matter of Kahn* [*National City Bank of N.Y.*], 284 NY 515; *Robinson v Robins Dry Dock & Repair Co.*, 238 NY 271; cf. *Kelly v Long Is. Light Co.*, 31 NY2d 25 [change in decisional law]).

The changes worked by a portion of the 1979 legislation went directly to the heart of the problem by eliminating State equalization rates as evidence in inequality proceedings. The Legislature prefaced its 1979 enactments with

a series of findings concerning the probative value of such rates. Section 1 of chapter 126 declared:

"The legislature hereby finds and determines, after carefully evaluating the impact of the provisions of subdivision three of section seven hundred twenty of the real property tax law in relation to permitting the use of the state equalization rate established for the roll in proceedings to review real property assessments, *that such provisions are not capable of valid application to assessments of business and commercial properties as well as residential properties in the particular assessing unit.* Moreover, in many instances the use of such equalization rate has not proven to be valid even in connection with the same types of property, and has often resulted in undesirable and unintended results.

"The legislature further finds that the reason such equalization rate is inappropriate and invalid is that the equalization rate established for the roll was never intended to determine property values for taxing purposes, but was intended only to be used in connection with equalizing state aid and to compute constitutional tax and debt limits. Therefore, the use of such equalization rate for the purpose of quantifying the ratio of assessment to market value within a taxing district produces spurious and counterproductive results.

"In view of the foregoing, the legislature hereby determines that the within provisions of this chapter should be enacted and that for all causes and purposes such provisions shall be deemed and construed as remedial in nature." (Emphasis supplied.)

Deletion of equalization rates as permissible evidence under subdivision 3 of section 720 briefly left parcel selection and proof of actual sales as the only admissible evidence by which to prove ratio. But immediately upon adoption of the quoted findings and the amendment of subdivision 3, the Legislature enacted a new chapter in which it revised the findings by adding a new paragraph (see L 1979, ch 127, § 1) and creating section 721 of the Real Property Tax Law. The new paragraph vitiated the earlier findings relative to the lack of probative value of equalization rates by laying the groundwork for renewed use of

such rates or other evidence by a particular class of residential owners. It declared: "In view of the foregoing *and in an effort to provide a remedy which would enable the individual, residential owner-petitioner to assemble and present in a summary and inexpensive manner evidence of inequality of assessment in review proceedings*, the legislature hereby determines that the within provisions of this chapter should be enacted and that for all causes and purposes such provisions shall be deemed and construed as remedial in nature." (See L 1979, ch 127, § 1; emphasis supplied.)

In furtherance of the new finding, section 721 provided that resident owners of structures containing three dwelling units or less could introduce *any* relevant evidence in an inequality proceeding, notwithstanding any provision of law to the contrary. It is undisputed by the instant litigants that the effect of this amendment is to permit certain residential owners to offer equalization rates in evidence while it remains forbidden to all others. Chapter 127 rendered the 1979 legislation retroactive to 1970 by providing (§ 3) that the new restrictions were applicable to all proceedings commenced after January 1, 1970 and not yet finally determined.

On these appeals, the petitioners and *amici* Rego Properties and Citizens Tax Council argue that: (1) the 1979 amendments to the Real Property Tax Law are constitutionally defective under the due process and equal protection clauses, and in any event should not apply at bar because they effect a substantive rather than a procedural change in existing law; (2) Special Term correctly declared portions of the 1978 amendments unconstitutional as violative of due process and as an unlawful delegation of legislative power; and (3) Special Term incorrectly found Nassau County to be qualified for a *Hellerstein* moratorium under subdivision 1 of section 307 of the Real Property Tax Law.

The county, the city and the Attorney-General contend that: (1) the 1979 amendments validly apply to this proceeding and require reversal of the partial summary judgment because they are remedial, evidentiary and procedural

in nature and disturb no constitutional rights; (2) if the 1979 amendments cannot be applied, then the 1978 amendments remain in effect and Special Term's action in voiding them was erroneous; and (3) Nassau County is a qualified jurisdiction for the purposes of section 307 of the Real Property Tax Law. Although it is obvious that a plenary action for a declaratory judgment would have provided a more appropriate method and a broader forum to test the statutes challenged here, the circumstances now confronting us—particularly the apparent confusion as to what laws now apply and how they are to be interpreted—militate in favor of compliance with the parties' requests that we rule on the constitutional issues posited. We can begin by noting, however, that we see no reason to disturb Special Term's determination that Nassau County qualifies for the benefits of subdivision 1 of section 307, relieving it temporarily from the need to comply with *Hellerstein*. The remaining aspects of the 1978 and 1979 legislation warrant a more intense consideration.

### Retrospective Application

Because the 1979 legislation declares that it is applicable to all proceedings commenced after January 1, 1970 in which no final determination has been made as of the effective date of the enactments, it is unnecessary to invoke rules of statutory construction to discover whether it has retroactive effect (see, e.g., *Matter of Mulligan v Murphy*, 14 NY2d 223; *Garzo v Maid of the Mist Steamboat Co.*, 303 NY 516; *People ex rel. Central Trust Co. v Prendergast*, 202 NY 188; cf. *Simonson v International Bank*, 14 NY2d 281; *Matter of Berkovitz v Arbib & Houlberg*, 230 NY 261; *Lazarus v Metropolitan El. Ry. Co.*, 145 NY 581; 2 Sutherland, Statutory Construction [4th ed], § 41.04, p 253; General Construction Law, §§ 93, 94 [general rules of construction regarding procedural matters]). No Federal constitutional objection to retrospective operation of a statute per se exists (see, e.g., *Cohen v Beneficial Loan Corp.*, 337 US 541; *Chase Securities Corp. v Donaldson*, 325 US 304; *Blount v Windley*, 95 US 173; *Watson v Mercer*, 8 Pet [33 US] 88; *Calder v Bull*, 3 Dallas [3 US] 386), nor is there any per se State constitutional inhibition which would pre-

clude the effectiveness of such statutes (see, e.g., *Matter of West*, 289 NY 423, affd *sub nom. Demorest v City Bank Co.*, 321 US 36; *Preston Co. v Funkhouser*, 261 NY 140, mot for rearg den 261 NY 639, affd 290 US 163; see, generally, Greenblatt, Judicial Limitations on Retroactive Civil Legislation, 51 NW U L Rev 540; Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv L Rev 692; Smith, Retroactive Laws and Vested Rights, 5 Tex L Rev 231, 6 Tex L Rev 409; and see *Dash v Van Kleeck*, 7 Johns 477, 499 [KENT, Ch. J., concurring; review of early objections to retrospective laws]). Invalidity of retrospective application thus must result from offense to some constitutional guarantee such as divestiture of "vested rights" under the Fourteenth Amendment (see *Usery v Turner Elkhorn Min. Co.*, 428 US 1; *Chase Securities Corp. v Donaldson, supra; Stockdale v Insurance Cos.*, 20 Wall [87 US] 323; *Matter of Chrysler Props. v Morris*, 23 NY2d 515; *Matter of Day v Mruk*, 307 NY 349; *People ex rel. Lovett v Randall*, 151 NY 497; *People ex rel. Le Roy v Foley*, 148 NY 677), vitiation of the contract clause of the Constitution (see *Watson v Mercer, supra; Satterlee v Matthewson*, 2 Pet [27 US] 380) or some other deficiency. At this point, however, our analysis touches upon the facial validity of a statute which purports to have retrospective effect on all pending legal proceedings, except those which have been subject to a "final" determination, for the Legislature itself provided that such determinations were to be excepted from its scope. For purposes of statutory interpretation, a final determination, like a final judgment, is a mandate which determines the rights of the parties at nisi prius after trial (see *Matter of City of New York [Chrystie St.]*, 264 NY 319). The finality of the determination is not affected either by the pendency of an appeal or by the fact that the time to appeal has not yet run (see *Matter of Bailey [Bush Term. Co.]*, 265 App Div 758, affd 291 NY 534). Such a judgment is dispositive of all factual and legal issues in the case, judicially settles the case between the parties (see *Van Arsdale v King*, 155 NY 325; *Devlin v Hinman*, 40 App Div 101, affd 161 NY 115), and will issue only after all factual and legal issues have been decided (see *Fales v Globe Knitting Co.*, 51 Hun 487;

see, generally, Cohen and Karger, Powers of the New York Court of Appeals, ch 3). Because the partial summary judgment at issue here—clearly an interlocutory judgment (see *Matter of Pierre Pellaton Apts. v Board of Assessors of County of Nassau*, 43 NY2d 769, *supra*)—did not finally adjudicate the entire proceeding, it is not a "final determination" within the meaning of the statute. If the interlocutory judgment is to escape the statutory sweep, it must do so on considerations other than the simple statutory language excising final determinations from its retroactive scope. Nevertheless, we note for our ultimate conclusion in this case that a statute constitutional when applied to one set of circumstances may contravene a constitutional guarantee when applied to another (see *Watson v Buck*, 313 US 387; *Matter of Westchester Reform Temple v Brown*, 22 NY2d 488; *Matter of Diocese of Rochester v Planning Bd. of Town of Brighton*, 1 NY2d 508). We turn, then, to the substance of the various enactments.

## The Constitutionality of the 1978 Legislation

Special Term's order declared unconstitutional those subdivisions of section 307 of the Real Property Tax Law which required inequality petitions to allege that the challenged assessments had been made at a higher proportionate ratio to value than that of other property of the same major type, as defined by the SBEA, and to offer evidence to such effect.

Scrutiny of the challenged subdivisions of section 307 reveals that they do not mandate that SBEA *ratios* relative to individual categories of property be introduced in evidence but only that the inequality be proven by comparison within the categories of property to be established by the SBEA. Special Term reasoned that the three latter subdivisions of section 307 were deficient because they constituted an invalid delegation of legislative power and because of the length of the retroactivity specified. We agree that the subdivisions are unconstitutional. Although section 307 of the Real Property Tax Law gives the appearance of merely regulating pleadings in tax review proceedings, it actually accomplishes a substantive remodeling of estab-

lished law governing the imposition of taxes without further enabling legislation as to requisite details. Prior to section 307, the Real Property Tax Law was firm in requiring, if not assessment of all property at its fair market value (see Real Property Tax Law, § 306), then assessment at a uniform fraction of fair market value for all property in the taxing unit (see *860 Executive Towers v Board of Assessors of County of Nassau*, 53 AD2d 463, *supra*). Section 307, however, requires proof of inequality predicated upon comparison to a particular class of property rather than all property within the district. Because its provisions were made applicable to all pending causes of action, the ultimate effect of the section, as Special Term concluded, was to "increase * * * or decrease * * * the amount at which property could be initially assessed." *(Matter of Slewett & Farber v Board of Assessors of County of Nassau*, 97 Misc 2d 637, 650, *supra.)* We deal, then, with a statute which has the effect of retrospectively sanctioning—and therefore imposing—a real property tax on property by class or type.

The general proposition is that "retroactive taxation is generally unconstitutional" *(RKO-Keith-Orpheum Theatres v City of New York*, 308 NY 493, 501). Notwithstanding this principle, however, whether a taxing statute which is expressly retroactive will be sustained "is usually a question of degree" *(People ex rel. Beck v Graves*, 280 NY 405, 409). In *Beck* the issue was the validity of a 1935 amendment to the Tax Law which purportedly imposed a State income tax on income derived from dealings in real or personal property located without the State, a departure from prior established tax policy. By its terms, the statute imposed a retroactive tax for the previous 16 years. In assessing the applicable precedents, the court concluded (p 409) : "Taxing statutes which by their terms were retroactive for short periods have been held to be valid. No case has ever held such a statute to be valid which attempted to permit a retroactive assessment of a tax for as long a period as sixteen years." On similar reasoning, a utility tax imposed in 1941 and made retroactive to 1937 was deemed " 'so harsh and oppressive as to transgress the constitutional limitation [of due process]' *(Welch v. Henry*, 305 U.S. 134, 147)" *(Matter of Lacidem Realty Corp. v Graves*, 288 NY

354, 357). These authorities comprise a sufficient precedential basis for a conclusion that the excessive retroactivity of subdivisions 3, 4 and 5 of section 307 of the Real Property Tax Law render them unconstitutional as applied to tax years prior to their effective date (cf. *Matter of Lacidem Realty Corp. v Graves, supra,* p 357 [full retroactivity voided; alternative limited retroactivity sustained]).

We also conclude that the prospective operation of the same subdivisions (see L 1978, ch 476, § 5, as extended) suffers from similar fatal deficiencies. The class system of taxation set forth in subdivision 3 of section 307 is not imposed uniformly against all taxpayers of the varying classes in the taxing district, but only upon those who have been brash enough to pursue a judicial remedy against the sovereign. Nowhere in the entire structure of the 1978 legislation can there be found statutory authority for the tax assessor to assess classes of property at varying rates. Indeed, the continuing mandate of the Real Property Tax Law—which has emerged unscathed from the seeming barrage of amendments—is that "[a]*ll* real property in each assessing unit" be assessed at its full valuation (Real Property Tax Law, § 306; emphasis supplied), or at least at a uniform fraction of full value.

It is beyond cavil that "[n]o taxpayer may be saddled with a discriminatory assessment which imposes on him more than his fair share of the total tax burden" *(Matter of Rokowsky v Finance Administrator of City of N.Y.,* 41 NY2d 574, 576). If the unequivocal and unaltered demand of the taxing statute itself is uniformity of assessment, it becomes impossible to view section 307 as creating a valid class tax system. Indeed, as Justice MANGANO pointedly observes in his concurring and dissenting opinion, section 706 of the Real Property Tax Law still requires the tax review petition to allege over-all inequality in addition to the class inequality required by section 307. In essence, then, the pleading mandate of section 307 seems to impose an additional tax liability upon the relatively small segment of taxpayers who litigate the inequality issue despite the plain prescription in the taxing scheme for uniformity of assessment. Furthermore, section 307 has introduced a new factor into inequality litigation—the correctness of the

assessment is made more probable by the fact that it is being litigated.

Although our paths to the result may differ, we all agree that the final three subdivisions of section 307 are a nullity.

## *The Equal Protection Challenge to the 1979 Legislation*

It is petitioners' contention that the Fourteenth Amendment guarantee of equal protection was violated by the 1979 amendments. At the core of this attack is the proposition that the statutory scheme encompassing subdivision 3 of section 720 and section 721 of the Real Property Tax Law is unconstitutional because it permits owners of certain residential real property to rely on State equalization rates or any "relevant" evidence while other taxpayers seeking to establish inequality are restricted to parcel selection and proof of sales to establish their claims.

We begin our analysis by noting that "when equal protection claims are to be weighed the rule is elementary that in taxation, even more than in other fields," the Legislature possesses "the greatest freedom in classification" *(Matter of Long Is. Light. Co. v State Tax Comm.*, 45 NY2d 529, 535; see, also, *Lehnhausen v Lake Shore Auto Parts Co.*, 410 US 356; *Allied Stores of Ohio v Bowers*, 358 US 522; *Madden v Kentucky*, 309 US 83; *Welch v Henry*, 305 US 134; *Carmichael v Southern Coal Co.*, 301 US 495; *Shapiro v City of New York*, 32 NY2d 96, app dsmd 414 US 804; *Matter of Grace v New York State Tax Comm.*, 37 NY2d 193; *Matter of Roosevelt Raceway v County of Nassau*, 18 NY2d 30, app dsmd 385 US 453). Therefore, despite petitioners' complaint that commercial and industrial real estate have been systematically overassessed in comparison to residential parcels, the constitutionality of a system of taxation based upon separate classifications of property is not the issue here. The 1979 amendments were intended to control evidence and not to impose a real estate tax. The equal protection question must be decided on more traditional criteria.

In this respect, the petitioners urge that we apply the "strict scrutiny" test to the challenged legislation, and,

indeed, the threshold question presented by any equal protection contention is the standard of scrutiny to which the legislative classification must be subjected. Where the challenged classification is drawn upon "suspect" lines, such as race *(Loving v Virginia,* 388 US 1; *Korematsu v United States,* 323 US 214), national origin (see *Castaneda v Partida,* 430 US 482; *Hernandez v Texas,* 347 US 475), alienage *(Nyquist v Mauclet,* 432 US 1; *Matter of Griffiths,* 413 US 717; *Sugarman v Dougall,* 413 US 634; *Graham v Richardson,* 403 US 365; cf. *Foley v Connelie,* 435 US 291), or if it impinges upon a "fundamental interest" such as voting *(Dunn v Blumstein,* 405 US 330; *Harper v Virginia Bd. of Elections,* 383 US 663), travel *(Shapiro v Thompson,* 394 US 618), procreation *(Skinner v Oklahoma,* 316 US 535), criminal appeal *(Griffin v Illinois,* 351 US 12), or exercise of First Amendment rights *(Carey v Brown,* 447 US 455; *Police Dept. of Chicago v Mosley,* 408 US 92), the legislation must withstand the gaze of "strict" judicial scrutiny. According to one prominent commentator, such scrutiny is strict merely in theory, for it is usually fatal in fact (see Gunther, The Supreme Court 1971 Term—Foreward: In Search of Evolving Doctrine on a Changing Court: A Model For Newer Equal Protection, 86 Harv L Rev 1, 8). Under strict scrutiny, the legislative end must be justified by a "compelling state interest" (see, e.g., *Memorial Hosp. v Maricopa County,* 415 US 250; *Eisenstadt v Baird,* 405 US 438 [dictum]; *Shapiro v Thompson, supra; Loving v Virginia, supra).* Moreover, the exactitude of the relationship between the means chosen—classification—and the legislative purpose to be served is carefully analyzed (see, e.g., *Carey v Brown, supra; Police Dept. of Chicago v Mosley, supra; Williams v Rhodes,* 393 US 23). Absent either a suspect classification or infringement of a fundamental interest, however, the challenged classification will survive if there is any "rational relationship" between it and the legislative end (see, e.g., *United States R.R. Retirement Bd. v Fritz,* 449 US 166; *Vance v Bradley,* 440 US 93; *Village of Belle Terre v Boraas,* 416 US 1; *Dandridge v Williams,* 397 US 471; *Rinaldi v Yeager,* 384 US 305; *McLaughlin v Florida,* 379 US 184; *McGowan v Maryland,* 366 US 420).

Although the Supreme Court has never formally abandoned its two-tier approach to the equal protection clause, during the past decade the "mere rationality" test has been applied with more intensified scrutiny than was the case under the Warren court (compare the "rational relationship" cases cited above with, e.g., *Trimble v Gordon*, 430 US 762; *Craig v Boren*, 429 US 190; *Stanton v Stanton*, 421 US 7; *Jimenez v Weinberger*, 417 US 628; *James v Strange*, 407 US 128; *Reed v Reed*, 404 US 71; see, also, *San Antonio School Dist. v Rodriguez*, 411 US 1, 70 [MARSHALL, J., dissenting]). This apparent permutation of "mere rationality" by stricter analysis has been perceived in some quarters as a third equal protection standard falling between the traditional two (see Gunther, The Supreme Court 1971 Term, 86 Harv L Rev 1; Tribe, American Constitutional Law, § 16-30 *et seq.)* and has been referred to as "sliding scale" (see *Montgomery v Daniels*, 38 NY2d 41, 61; Gunther, 86 Harv L Rev 1).

The petitioners' assertion that the legislative classification established by subdivision 3 of section 720 and section 721 impinges upon their fundamental right to judicial access and is subject to strict scrutiny is based on their reading of *Boddie v Connecticut* (401 US 371). We deem the claim that *Boddie* endowed access to the judicial system with a fundamental status to be meritless in view of *Montgomery v Daniels (supra)*, which involved the constitutional validity of the no-fault scheme. In *Montgomery*, the Court of Appeals noted that judicial access is not intrinsically fundamental, although it could achieve special constitutional protection if the underlying right sought to be vindicated had preferred constitutional status and a nonjudicial alternative forum was unavailable. Here, however, access in the limited and literal sense of the word (see *Ortwein v Schwab*, 410 US 656, reh den 411 US 922; *United States v Kras*, 409 US 434; *Boddie v Connecticut, supra)* has not been impeded by imposition of courthouse barriers such as the filing fees which denied indigent plaintiffs the means to redress their grievances in *Boddie*. Furthermore, the underlying right subject to vindication—that of obtaining a tax refund—does not appear to warrant preferred constitutional status in the sense of the cited precedents.

But if strict scrutiny is not the applicable criterion, neither does this case provide the appropriate scenario for an intermediate level of scrutiny. The "sliding scale" test is utilized where important but less than fundamental or preferred interests are implicated (see, e.g., *Turner v Department of Employment Security*, 423 US 44, 46 ["basic human liberties"]; *Cleveland Bd. of Educ. v LaFleur*, 414 US 632 [maternity leave restrictions burdening "protected freedom" to bear a child]; *Stanley v Illinois*, 405 US 645 ["cognizable and substantial" interest]) or where "sensitive, although not necessarily suspect" criteria of classification are employed (Tribe, *op. cit.*, § 16-31, p 1090; see, e.g., *Trimble v Gordon, supra* [illegitimacy]; *Reed v Reed, supra* [gender], but, cf. *Frontiero v Richardson*, 411 US 677 [plurality, applying strict scrutiny to gender classification]). In our view, the claim that other taxpayers are bearing a proportionately lesser share of the tax burden than petitioners cannot be categorized as similar to those upon which the Supreme Court has relied in invoking stricter standards of equal protection review. Thus we will evaluate the current challenge on the least harsh of the available tests—the rational basis standard.

Under rational basis analysis, the enactment must be upheld "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the legislature's actions were irrational" *(Vance v Bradley*, 440 US 93, 97, *supra* [5th Amdt equal protection], quoted in *Barry v Barchi*, 443 US 55, 67 [14th Admt equal protection]; cf. *Royster Guano Co. v Virginia*, 253 US 412, 415; see, generally, Note, Legislative Purpose, Rationality, and Equal Protection, 82 Yale LJ 123; Tussman & tenBroek, The Equal Protection of the Laws, 37 Cal L Rev 341). All methods of equal protection evaluation involve a two-stage process to determine whether the offending classification rests on grounds related in requisite degree to achievement of the State's interest, regardless of whether the interest is labelled "compelling" or simply "legitimate". Only after the basis for the classification and the governmental interest allegedly furthered have been ascertained can it be determined whether the classification

rests upon a ground having the demanded nexus to the legislative objective (see *Massachusetts Bd. of Retirement v Murgia*, 427 US 307; *Johnson v Robison*, 415 US 361; *McGinnis v Royster*, 410 US 263; *Reed v Reed*, 404 US 71, *supra; Matter of Abrams v Bronstein*, 33 NY2d 488 [RABIN, J.]).

In applying these criteria, the fact that the overriding legislative motivation appears to be an effort to make recovery highly difficult for nonresidential property owners is not controlling. Absent the comparatively limited circumstances involving facially neutral legislation having a racially discriminatory or similarly suspect impact (see *Arlington Hgts. v Metropolitan Housing Corp.*, 429 US 252; *Washington v Davis*, 426 US 229; cf. *Palmer v Thompson*, 403 US 217; see, generally, Tribe, *op. cit.*, § 16-18), a court is relegated to evaluating the State interest purportedly advanced rather than the lawmakers' motivation (see *Johnson v Robison, supra; McGinnis v Royster, supra; Palmer v Thompson, supra; United States v O'Brien*, 391 US 367; *Arizona v California*, 283 US 423; *McCray v United States*, 195 US 27; *Fletcher v Peck*, 6 Cranch [10 US] 87). The court "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive" *(United States v O'Brien, supra*, p 383; see, also, *Matter of City of New York [Ely Ave.]*, 217 NY 45, mot for rearg den 217 NY 665; *Kittinger v Buffalo Traction Co.*, 160 NY 377; *People v Petrea*, 92 NY 128; *People ex rel. Wood v Draper*, 15 NY 532; cf. *Mason v Jones*, 3 NY 375; see, generally, Brest, Palmer v Thompson: An Approach to the Problem of Unconstitutional Legislative Motive, 1971 Sup Ct Rev 95; Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale LJ 1205). Thus, if the legislative end to be served is "otherwise constitutional", it will not lose its validity because its further purpose may be to deprive nonresidential taxpayers of their tax refunds.

Whatever its actual motivation, the legislative intent and the governmental interest to be advanced by the 1979 laws are stated in the findings which purport to set forth the reasons for the enactments. Section 1 of chapter 126 proclaims that the State equalization rate is "not capable of valid application to assessments of business and commercial

properties *as well as* residential properties in the particular assessing unit * * * and has often resulted in undesirable and unintended results" (emphasis supplied). Then, in a criticism reminiscent of the judicial pronouncements which preceded the *Guth* case (34 NY2d 440, *supra)*, the Legislature further found "that the reason such equalization rate is inappropriate and invalid is that the equalization rate established for the roll was never intended to determine property values for taxing purposes * * * [Its] use * * * for the purpose of quantifying the ratio of assessment to market value within a taxing district produces spurious and counter-productive results." Subdivision 3 of section 720 of the Real Property Tax Law then was altered to extinguish the right of either party to prove its case by use of a type of evidence characterized as nonprobative, "spurious and counter-productive" (see L 1979, ch 126, § 1).

The equal protection infirmity of the challenged classification derives from the fact that it singles out resident owners of properties containing three or less dwelling units as the only group entitled "to assemble and present in a summary and inexpensive manner evidence of inequality of assessment" (L 1979, ch 127, § 1) and permits them to introduce "any evidence deemed relevant and material to establishing the relationship between the assessed value and the market value of [qualifying] real property notwithstanding any provision of law to the contrary" (Real Property Tax Law, § 721). Since it is undisputed that this class of property owners—doubtless the majority—would be the only one permitted to offer equalization rates or other proof which does not fall within the category of actual sales or parcel selection, the legislation obviously favors them. Whether this favoritism fatally affects the legislation is the dispositive question.

Prior to *Hellerstein* (37 NY2d 1, *supra)*, the settled rule of real property taxation in this State required that fractional assessment be at a uniform percentage of full market value for all properties within the taxing unit and not merely for a particular category of real property (see *C.H.O.B. Assoc. v Board of Assessors of County of Nassau,* 45 Misc 2d 184, affd 22 AD2d 1015, affd 16 NY2d 779). No rational explanation can support the availability to one

class of taxpayers of a State equalization rate which the Legislature has characterized as "spurious and counter-productive" or some other unspecified (and unfathomable) method of proof, when inequality of tax burden is established by proof of the ratio at which all property has been assessed without regard to class. For purposes of judicial review of unequal assessment, all taxpayers are similarly circumstanced, for all are taxed without regard to class, and all must establish the same fact of inequality. "[A] statutory discrimination between two like classes cannot be rationalized by assigning them different labels" *(Richardson v Belcher,* 404 US 78, 83). If left intact, the challenged scheme inevitably must lead to the establishment of separate inequality ratios for owner-occupied residential property as opposed to all other categories. Given the effect of *Guth* (34 NY2d 440, *supra)* and *860* (53 AD2d 463, *supra)* upon the ability of assessing authorities to challenge equalization rates, it is apparent that the practical consequences of chapters 126 and 127 in each taxing unit will be an equalization rate-based ratio for resident homeowners and different ratios for those subjected to the evidence restrictions contained in subdivision 3 of section 720. The constitutional frailty of such a classification system already has been noted.

Finally, it is our view that the financial resources of taxpayers cannot provide an equal protection foundation for the discrimination between classes of owners under these circumstances. Although class distinctions predicated upon wealth are nonsuspect, distinctions based upon financial resources must still bear a rational relationship to the legislative goal (see *San Antonio School Dist. v Rodriguez,* 411 US 1, *supra).* The availability of the State rate—or some other mysteriously unspecified method of proof—for use by resident homeowners regardless of their financial means can have no rational relationship to the stated goal of the statute to forbid the introduction of evidence found grossly flawed by the lawmakers.

■■ While the conclusion thus compelled is that the statutory scheme fails on equal protection principles, we are bound by the enactments themselves (see L 1979, ch 126, § 3; ch 127, § 4) and by other jurisprudential prin-

ciples to excise only the portion which creates the difficulty (see, e.g., *United States v Jackson*, 390 US 570; *Carter v Carter Coal Co.*, 298 US 238; *Gaynor v Marohn*, 268 NY 417; *People ex rel. Stafford v Travis*, 231 NY 339). Since the scheme is unconstitutional because section 721 of the Real Property Tax Law extends to certain residential owners the right to offer evidence—declared productive of "spurious and counter-productive results" by the Legislature—which other taxpayers are forbidden to offer, it is 721 which must be stricken, leaving subdivision 3 of section 720 standing because it offers uniformity of application. Whether subdivision 3 of 720 deprives petitioners of due process because it deprives them of recourse to establish inequality is the next issue to be considered.

### Due Process

There can be little doubt that the plenary power of taxation is the very essence of sovereignty (see, e.g., *McCulloch v Maryland*, 4 Wheat [17 US] 316; *People ex rel. Hatch v Reardon*, 184 NY 431, affd 204 US 152), but the long-established rule is that the sovereign power to tax must be wielded within constitutional restraints: "The Legislature can no more arbitrarily impose an assessment for which property may be taken and sold, than it can render a judgment against a person without a hearing. It is a rule founded on the first principles of natural justice older than written constitutions, that a citizen shall not be deprived of his life, liberty or property without an opportunity to be heard in defense of his rights" *(Stuart v Palmer*, 74 NY 183, 190; see, also, *People ex rel. Hatch v Reardon, supra)*.

It further has been observed that the exaction of a tax made without either apportionment or appraisal could be "condemned as depriving the owner of his property without due process of law and without just compensation" *(People v Equitable Trust Co. of New London*, 96 NY 387, 395-396). The judicial review provisions of article 7 of the Real Property Tax Law were designed to afford aggrieved taxpayers their due process right to challenge tax assessments on their real property (cf. *People ex rel. Warren v Carter*, 109 NY 576). Nevertheless, the aggrieved are required to pay the tax on pain of sale of their property by the sovereign (see

Real Property Tax Law, § 1000 *et seq.*), although they are provided with recourse to obtain a refund of taxes (see Real Property Tax Law, § 704, subd 1).

The petitioners' due process attack on the face of the 1979 enactments is that the legislation deprives them of their "vested right" (see *Matter of Chrysler Props. v Morris*, 23 NY2d 515, *supra)* in the substantive rule that real estate taxes be levied in proportion to value. That rule, of course, remains in the statute (see Real Property Tax Law, § 306; cf. NY Const, art XVI, § 2), and the county notes that the 1979 enactments deal solely with evidentiary rules by which the right to proportionate valuation may be enforced rather than with substantive rules of tax law. The complaint, of course, is that the petitioners have been deprived of any means of proving that the rule has been violated.

It is elementary that "no person has a vested interest in any rule of law, entitling him to have it remain unaltered for his benefit" *(Truax v Corrigan,* 257 US 312, 348; see, also, *Middleton v Texas Power & Light Co.,* 249 US 152; *New York Cent. R.R. Co. v White,* 243 US 188; *Matter of West,* 289 NY 423, affd *sub nom. Demorest v City Bank Co.,* 321 US 36, *supra); Preston Co. v Funkhouser,* 261 NY 140, mot for rearg den 261 NY 639, affd 290 US 163, *supra; Brearley School v Ward,* 201 NY 358), although property rights which have vested by virtue of such a rule may not be disturbed by its modification (see *Matter of McGlone,* 284 NY 527, affd *sub nom. Irving Trust Co. v Day,* 314 US 556; *Burch v Newbury,* 10 NY 374, 386 [opn of JEWETT, J.]; *Matter of Kornbluth v Reavy,* 261 App Div 60, mot for rearg den 261 App Div 1018). The absence of a vested right in a rule of law has particular reference to statutes relating to remedy and procedure, subjects frequently treated as within the exclusive control of the legislative bodies (see, e.g., *Gibbes v Zimmerman,* 290 US 326; *Insurance Co. v Glidden Co.,* 284 US 151; *League v Texas,* 184 US 156). Therefore, such statutes are generally applied retroactively to pending actions (see, e.g., *Preston Co. v Funkhouser, supra; Laird v Carton,* 196 NY 169; *Peace v Wilson,* 186 NY 403; *Lazarus v Metropolitan El. Ry. Co.,* 145 NY 581; cf. *Jacobus v Colgate,* 217 NY 235)

without impairing any vested rights even though the remedy or procedure applicable as a result of the change differs from that in existence when the action was instituted or accrued (see, e.g., *Preston Co. v Funkhouser, supra; Sackheim v Pigueron,* 215 NY 62; *Southwick v Southwick,* 49 NY 510).

The rules of evidence, because they relate to remedy (see *Board of Comrs. of Excise of City of Auburn v Merchant,* 103 NY 143; *Howard v Moot,* 64 NY 262), are no exception to the vested rights principles discussed, for there is no right to have a controversy determined by a previously existing rule of evidence (see *Marx v Hanthorn,* 148 US 172; *Potter of Ogden,* 136 NY 384; *People v Turner,* 117 NY 227, 145 NY 451, affd 168 US 90; *Hickox v Tallman,* 38 Barb 608; 2 Cooley, Constitutional Limitations [8th ed], ch XI, pp 766-770). As Professor Wigmore has observed, the rules of evidence are merely methods for ascertaining facts, and their alteration does not take the facts from the parties: "[I]t is merely that good evidence has been given the one, or bad evidence been taken from the other" (1 Wigmore, Evidence [3d ed], § 7, p 212).

The due process question, then, is whether the alteration in evidentiary rules has totally deprived tax review petitioners of their right to a tax refund, for due process demands that litigants be afforded a reasonably efficient mode of redress for their wrongs (see, e.g., *Gibbes v Zimmerman, supra; Crane v Hahlo,* 258 US 142; *Ettor v Tacoma,* 228 US 148; *York v Texas,* 137 US 15; *Poindexter v Greenhow,* 114 US 270; *Gilman v Tucker,* 128 NY 190; *Matter of Mortgage Comm. of State of N. Y.* [*1175 Evergreen Ave.*], 270 NY 436, affd *sub nom. Lauro v Barker,* 299 US 521; *Myer v Myer,* 271 App Div 465, affd 296 NY 979; *Matter of Compton & Co. v Williams,* 248 App Div 545; cf. *Brinkerhoff-Faris Co. v Hill,* 281 US 673; *Montgomery v Daniels,* 38 NY2d 41, *supra).* A law "which would practically shut out the evidence of a party and thus deny him the opportunity for a trial would substantially deprive him of due process of law * * * But so long as the legislature, in prescribing rules of evidence, in either civil or criminal cases, leaves a party a fair opportunity to make his defense and

to submit all the facts to the jury to be weighed by them, upon evidence legitimately bearing upon them, it is difficult to perceive how its acts can be assailed upon constitutional grounds" *(Board of Comrs. of Excise of City of Auburn v Merchant*, 103 NY 143, 148, *supra)*.

The critical distinction is between the right of judicial recourse and the right to a particular remedy. While there may be a vested right to the former, there is none in the latter (see, e.g., *Gibbes v Zimmerman, supra; Graham & Foster v Goodcell*, 282 US 409; *Forbes Boat Line v Board of Comrs.*, 258 US 338; *Ettor v Tacoma, supra; Pritchard v Norton*, 106 US 124) unless the right and the remedy are so intertwined that destruction of the one concomitantly destroys the other (see *Worthen Co. v Kavanaugh*, 295 US 56; *James v Oakland Traction Co.*, 10 Cal App 785; cf. *Home Bldg. & Loan Assn. v Blaisdell*, 290 US 398). Although "a vester cause of action is property and is protected from arbitrary interference *(Pritchard v. Norton*, 106 US 124, 132), [an aggrieved party] has no property, in the constitutional sense, in any particular form of remedy; all that he is guaranteed by the Fourteenth Amendment is the preservation of his substantial right to redress by some effective procedure" *(Gibbes v Zimmerman*, 290 US 326, 332, *supra;* see, also, *Insurance Co. v Glidden Co.*, 284 US 151, *supra; Crane v Hahlo, supra; Ettor v Tacoma, supra; Backus v Fort St. Union Depot Co.*, 169 US 557; *Iowa Cent. Ry. Co. v Iowa*, 160 US 389; cf. *Brinkerhoff-Faris Co. v Hill, supra)*.

Petitioners argue that deprivation of the right to offer the State equalization rate amounts to deprivation of the right to recover a refund founded on inequality of tax burden. Facially, at least, the extinction of equalization rates as evidence of inequality would not appear to divest the right to redress since the parcel selection system or proof of actual sales still remain in the statute. But whether these methods—criticized as "not only [creating] discouraging and enormous expense for the taxpayer, but [promoting] the search by both sides for samples which are at the extreme ends of the spectrum—the same egregious problem we seem always to find in expert valuation testimony in

condemnation cases" *(Guth Realty v Gingold*, 34 NY2d 440, 449-450, *supra)*—have become illusory to the extent of unconstitutionality requires some further analysis.

The prohibitive nature of the expense involved in parcel selection was demonstrated in the *860* case (53 AD2d 463, affd *sub nom. Matter of Pierre Pellaton Apts. v Board of Assessors of County of Nassau*, 43 NY2d 769, *supra)*. There, some 33 parcels were utilized as evidence of ratio for the eight years involved. Having triumphed, the *860* petitioners asserted in their claim for costs (see Real Property Tax Law, § 716) that legal research and preparation for the action consumed 2,000 hours of their attorney's time. Our examination of the *860* record reveals that the inequality trial extended over 50 full or partial days, generating some 7,000 pages of trial transcript. Nassau County selected some of the largest and most difficult properties in the county to appraise, including a Long Island Lighting Company generating plant and the Mid-Island Shopping Center. The *860* cost request included bills totaling some $281,000 for experts retained to testify and to prepare appraisals, statistical and methodological research for the petitioners, and $270,000 more for legal services. Of the total of these amounts, $484,000 was attributed to parcel selection expenses. The costs affirmed by this court were in the stipulated reasonable sum of $435,000.

But if parcel selection seems an unconstitutionally expensive method by which to prove inequality, it is not the exclusive method, for the challenged statute also permits proof of actual sales. While the Constitution protects an aggrieved taxpayer's right to an "effective" method of obtaining redress (see *Gibbes v Zimmerman, supra*, p 332) it does not mandate—as Justice COHALAN seems to posit in his analysis—that taxpayers be provided a cheap means of establishing that their parcels have been assessed in unequal proportion to the assessment of thousands or hundreds of thousands of other parcels. Indeed, the use of equalization rates—certainly an inexpensive method of proof—was impossible prior to 1961 and was not even recognized as probative until *Guth (supra)* in 1974. What the Constitution certainly does prohibit is *de facto* abolition of remedy by limitation of proof to methods so prohibitively expensive in

comparison with other potentially probative means as to effectively deprive all but the highly affluent of the ability to establish the right to relief. On the limited record before us, petitioners have not established that the cost of proving actual sales is so exorbitant as to render the method illusory. Examination of the *Guth* record reveals that petitioners there offered all three permissible types of proof and recovered attorney's and expert's fees in the amount of $82,000 (see Real Property Tax Law, § 716). Of that amount, comparatively little was expended on proof of actual sales as compared to the sums expended for parcel selection and research into SBEA equalization methodology. Furthermore, the *Guth* petitioners were required to analyze some 11,800 sales for the years in question and were prepared to subpoena all grantors and grantees because of their belief that in the absence of a stipulation admitting proof of sales price by revenue stamps—which the City of Syracuse refused to enter into—the accuracy of the transactions could be ascertained only by calling the individual parties. Ultimately, however, the trial court limited the parties to proof of 100 rather biased screened sales. This limitation of actual sales proof made it so inconclusive as to prompt the Appellate Division to eschew any reliance on it (see 41 AD2d 479, 483).

The petitioners contend, however, that the random sampling method used in *Matter of Mid-Island Shopping Plaza v Podeyn* (25 Misc 2d 972, affd 14 AD2d 571, affd 10 NY2d 966, *supra*), has been foreclosed by *Matter of Tilsac Corp. v Assessor of Town of Huntington* (55 Misc 2d 431, affd 41 AD2d 604, mot for lv to app den 32 NY2d 611, *supra*), and that proof of all actual sales in Nassau County, asserted to be 20,000 annually, would be prohibitively expensive. But *Tilsac* does not stand for the proposition that random sampling cannot be utilized in a ratio trial; that case simply rejected the models relied upon by the *Tilsac* petitioners as being demonstrably inaccurate and defective. The petitioners' failure in *Tilsac* deprives us of any record by which to ascertain the cost of proof of actual sales in that case, and the record in *Matter of Standard Brands v Walsh* (92 Misc 2d 903, affd 60 AD2d 605) also has been of no assistance since costs were not passed upon there.

█ The familiar rule apportioning burden of proof when the constitutionality of a statute is in question requires the party urging invalidity to overcome the exceedingly strong presumption of constitutionality by proof of invalidity beyond a reasonable doubt (see *Matter of Malpica-Orsini*, 36 NY2d 568, 570, app dsmd *sub nom. Orsini v Blasi*, 423 US 1042; *Matter of Rosenthal v Hartnett*, 36 NY2d 269; *People v Scott*, 26 NY2d 286). Petitioners' eschewal of a plenary action attacking constitutionality leaves them and this court with significantly limited means of exploring the issues raised; we may examine the face of the statute and matters in the record, take note of the authorities and rely on matters and information of which judicial notice may be taken. But we can receive no testimony or other evidence for which a trial foundation would be required. So constricted in our inquiry, we must conclude that the unconstitutionality of subdivision 3 of section 720 of the Real Property Tax Law has not been established here because it still seems to offer proof of actual sales as a means by which inequality may be proven.

### *The Ultimate Infirmity*

Despite our conclusion that the current version of subdivision 3 of section 720 passes constitutional muster on the basis of the limited record before us, we believe that it may not be applied constitutionally to tax review petitioners who have litigated their way to interlocutory adjudications fixing ratio prior to the enactment of the amendment which excluded use of equalization rates to prove inequality.

It is almost a truism that the Legislature may not "confiscate, recall or put again in jeopardy the rights and property established by judgments already obtained" *(Matter of Greene*, 166 NY 485, 492; see, also, *Feiber Realty Corp. v Abel*, 265 NY 94; *Livingston v Livingston*, 173 NY 377). Although the judgment under review is not final in the sense the term is used in traditional due process analysis of vested rights flowing from a judgment (see *Livingston v Livingston, supra; Gilman v Tucker*, 128 NY 190, *supra;* see, also, *Matter of Boardwalk & Seashore Corp. v Murdock*, 286 NY 494; *Feiber Realty Corp. v Abel, supra; Ger-*

*mania Sav. Bank v Village of Suspension Bridge*, 159 NY 362; *Walker v Walker*, 155 NY 77), it is clearly interlocutory in nature *(Matter of Pierre Pellaton Apts. v Board of Assessors of County of Nassau*, 43 NY2d 769, affg *860 Executive Towers v Board of Assessors of County of Nassau*, 53 AD2d 463, *supra;* see CPLR 5011) and it has established a crucial element of petitioners' claim.

Under apparent prevailing practice in Nassau County and other places, the trial of a tax review proceeding in which ratio is in issue is bifurcated, the first phase being devoted to ratio and the second to the valuation of the subject parcel (see, e.g., *860 Executive Towers v Board of Assessors of County of Nassau, supra)*. The Legislature's understanding of the importance of a ratio trial is clearly indicated by the statutory provision for reimbursement of the costs expended by taxpayers who have succeeded in establishing a ratio which does not exceed the percentage claimed in their demand upon the assessing authority for an admission of the rate (see Real Property Tax Law, § 716, subd 1). Such successful petitioners may immediately apply for recovery of reasonable expert's and attorney's fees incurred in making the proof (Real Property Tax Law, § 716, subd 2) and may recover "irrespective of the results of the proceeding" (Real Property Tax Law, § 716, subd 2). In *860*, the recovery was $435,000.

Our conclusion that petitioners' interlocutory judgment of ratio may not be extinguished by legislative fiat concerning the rules of evidence is founded on more basic criteria, however. The application of the newly amended subdivision 3 of section 720 to the instant adjudication of ratio would annul the determination of a judicial tribunal which was competent to make it and substitute in its stead the determination of the Legislature that the petitioners' evidence— competent and material when offered and when judgment was rendered—was incompetent and therefore impermissibly received as proof of ratio.

In the context of technically final judgments, at least, legislative efforts to undo the proper judgments of courts have been invalidated as illicit encroachments on the judicial function (see, e.g., *McCullough v Virginia*, 172 US 102;

*United States v Klein*, 13 Wall [80 US] 128; *Matter of Greene*, 166 NY 485, *supra; Roberts v State of New York*, 30 App Div 106, affd 160 NY 217; *Griffin's Ex'or v Cunningham*, 61 Va [20 Gratt] 31; *Arnold v Kelley*, 5 W Va 446; *Taylor & Co. v Place*, 4 RI 324; *Lewis v Webb*, 3 Me [3 Greenl] 326; *De Chastellux v Fairchild*, 15 Pa [3 Har] 18; *Denny v Mattoon*, 84 Mass [2 Allen] 361; *McNichol v United States Mercantile Reporting Agency*, 74 Mo 457; see, also, *Stephens v Cherokee Nation*, 174 US 445; *United States v Peters*, 5 Cranch [9 US] 115; *People ex rel. MacDonald v Keeler*, 99 NY 463; *Hooker v Hooker*, 18 Miss [10 Sm & M] 599; *Opinion of Justices*, 3 RI 299; cf. *United States v Sioux Nation of Indians*, 448 US 371; *Pope v United States*, 323 US 1; *Wrought Iron Bridge Co. v Town of Attica*, 119 NY 204; *Howell v City of Buffalo*, 37 NY 267; see, generally, 1 Cooley, Constitutional Limitations [8th ed], ch V, pp 179-194). The early dates of almost all of the cited cases and the existence of procedural rules making appealability dependent on technical finality make it unlikely, however, that in a separation of powers context finality in the technical sense was the controlling element. In a somewhat analogous situation, two Federal courts have analyzed the finality requirement in light of the policy to be served and concluded that the term does not have a uniform definition for all purposes (see *Lummus Co. v Commonwealth Oil Refining Co.*, 297 F2d 80, cert den *sub nom. Dawson v Lummus Co.*, 368 US 986; *Sherman v Jacobson*, 247 F Supp 261). The *Lummus* court (p 89) noted that, for collateral estoppel purposes: "Whether a judgment, not 'final' in the sense of [appealability considerations], ought nevertheless be considered 'final' in the sense of precluding further litigation of the same issue, turns upon such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review. 'Finality' in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." (See, also, Restatement, Judgments 2d, Tent Draft No. 1, § 41, comment g.) Indeed, two eminent treatise authors have explained that, "[i]t is clear that the essential characteristic of the inter-

locutory judgment is that it finally adjudicates substantial issues on the merits of the case as framed by the pleadings" (Cohen and Karger, Powers of the New York Court of Appeals, § 15, p 68).

The interlocutory judgment in this case is highly analogous to interlocutory judgments in other dichotomized actions. Here, it established the right of the petitioners to go forward and prove the extent of inequality and the amount of refund due as a consequence either of inequality or overvaluation. In an accounting action, the interlocutory judgment does scarcely more—it too establishes the right of the plaintiff to go forward and prove the sums due (see, e.g., *Krauss v Putterman,* 51 AD2d 551; *Corwin v Kaufman,* 37 AD2d 838; *Wood v Cross Props.,* 5 AD2d 853). In the same sense, an interlocutory judgment of liability in a bifurcated tort trial constitutes a factual and legal determination of fault from which the consequences of liability will flow if plaintiff is able to prove damages in the second phase of the trial. In our view, petitioners' judgment as to ratio is as resistant to overthrow by ex post facto change in the rules of evidence as would be judgments establishing fault or the right to an accounting based on evidence that was legal and competent when introduced. Under the circumstances, a judgment such as the instant one is immune to legislative tinkering intended to undo a fairly and properly won adjudication of the vital fact from which the right to recover in a subsequent phase of the action ultimately flows.

Under our State Constitution, the powers of government are apportioned among the executive, legislative and judicial branches; "one makes the laws, another construes and adjudges as to the rights of persons to life, liberty and property thereunder, and the third executes the laws enacted and the judgments decreed" *(People ex rel. Broderick v Morton,* 156 NY 136, 144; see, also, *People ex rel. Burby v Howland,* 155 NY 270). A function unique to any exercise of judicial power is "the application of the law to concrete facts and, therefore, the investigation and establishment of the facts" (1 Wigmore, Evidence [3d ed], § 7, p 213). If the amended subdivision 3 of section 720 is applicable to interlocutory judgments such as the instant one, then the

Legislature has not merely altered the law so as to require a judgment properly rendered to be reversed by virtue of supervening substantive changes (see, e.g., *Matter of Suddell v Zoning Bd. of Appeals of Vil. of Larchmont*, 36 NY2d 312; *Matter of Demisay, Inc. v Petito*, 31 NY2d 896), it has altered procedure so as to declare that the judgment was never properly rendered at all and that the facts established by that judgment no longer exist in that proceeding. Although the alteration of procedure has suppressed any potential collateral estoppel effects which might otherwise derive from the judgment because it was predicated upon the supplanted evidentiary rules (see *Schwartz v Public Administrator of County of Bronx*, 24 NY2d 65, 72; Restatement, Judgments 2d, Tent Draft No. 4, § 68.1, subd [b]), it cannot strip these petitioners of the direct benefits of the judgment itself without offense to basic constitutional precepts relating to separation of powers.

In the final analysis, the 1979 legislation would divest the petitioners of a substantial and not merely a procedural right by application of the statute to ratio adjudications already made. The ratio evidence was competent when admitted and resulted in an interlocutory judgment that the facts of ratio urged did exist. The petitioners thus obtained a substantial right to an adjudication predicated upon certain established facts. It is worthwhile to recall that an assertion that rights are vested "is a fiction and hides many unmentioned considerations of fairness to the parties, reliance on pre-existing law, the extent of retroactivity and the nature of the public interest to be served" *(Matter of Chrysler Props. v Morris*, 23 NY2d 515, 518, *supra)*. We conclude that an adjudication such as the instant one, properly obtained and based on the facts as found and supported by an interlocutory judgment, cannot be overthrown to the detriment of successful litigants by legislative edict changing the method by which it was obtained. Insofar as the 1979 legislation purports to upset existing interlocutory judgments fixing ratio, it fails not only on separation of powers considerations, but because it has consequences so harsh and is oppressive enough to violate the fundamental fairness implicit in due process (see *United States Trust Co. v New Jersey*, 431 US 1; *Usery v Turner Elkhorn Min. Co.*,

428 US 1, *supra; Welch v Henry*, 305 US 134, *supra).* Therefore, subdivision 3 of section 720 of the Real Property Tax Law is unconstitutional in its current application.

Accordingly, the order appealed from should be modified to insert decretal paragraphs (1) declaring section 721 of the Real Property Tax Law unconstitutional; (2) declaring subdivision 3 of section 720 of the Real Property Tax Law constitutional; (3) declaring the same section unconstitutional as applied; and (4) otherwise affirming the order at Special Term, which, *inter alia,* (a) granted summary judgment and declared that subdivisions 3, 4, and 5 of section 307 of the Real Property Tax Law are unconstitutional and (b) held that the county is entitled to the benefits of subdivisions 1 and 2 of section 307 of the Real Property Tax Law.

MANGANO, J. (concurring in part and dissenting in part). I agree that subdivisions 3, 4 and 5 of section 307 of the Real Property Tax Law are unconstitutional. I would only like to explain my interpretation of the tortuous language and obscured intent of subdivision 3 of that section. To do so, I must view subdivision 3 in the context of the Legislature's entire 1978 scheme for pleading and proving a claim of inequality in a proceeding to review a real property assessment.

By chapter 476 of the Laws of 1978, section 307 was added to the Real Property Tax Law and section 720 was amended. Subdivision 3 of the former essentially regulated pleadings in assessment review proceedings, while subdivision 3 of the latter regulated evidence.

A literal construction of the statutory language of these two provisions results in procedural requirements of a rather confusing nature.

Initially, it must be pointed out that sections 307 and 720 have to be read in conjunction with section 706 of the Real Property Tax Law. That section sets forth the basic contents of a petition in an assessment review proceeding. By its terms, when a proceeding is brought to review an assessment on the ground that it has been made at a higher proportionate valuation than that of other real property on the

same roll, the petition shall state that the petitioner is or will be injured by such inequality.

Without disturbing section 706, the Legislature enacted section 307, which, in subdivision 3, requires: "in a tax review proceeding which is based in whole or in part on a claim of inequality * * * the petition required by section seven hundred six of this chapter shall allege, *in addition to the contents otherwise required by such section*, that the assessment has been made at a higher proportionate valuation than the assessment of other taxable real property of the same major type, as determined by the state board of equalization and assessment pursuant to section twelve hundred of this chapter". (Emphasis added.) Thus, the 1978 legislation seemingly established pleading requirements that would necessitate a petition alleging inequality based on the subject property's inclusion in two distinct classes of property, viz., that of all properties on the same assessment roll (Real Property Tax Law, § 706) and that of all properties of the same major type on the same assessment roll (Real Property Tax Law, § 307, subd 3).

Subdivision 3 of section 307 continues, and the confusion is compounded. It reads that "evidence to such effect [a vague phrase] may be introduced together with such evidence *otherwise admissible* under subdivision three of section seven hundred twenty of this chapter." (Emphasis added.) Again, literally construed, this language seems to indicate that *any* evidence showing the assessment inequality of the subject property with properties in the same class, as that class is determined by the SBEA, may be introduced in the proceeding. Furthermore, this evidence may be offered in addition to such evidence otherwise admissible under subdivision 3 of section 720.

In turn, subdivision 3 of section 720 (as amd by L 1978, ch 476, § 2) sets forth the three types of evidence admissible on the issue of inequality in any assessment review proceeding. The 1978 version of this provision authorizes the very same evidence as had been authorized for such proceedings since 1961 (L 1961, ch 942, § 1), i.e., (1) selected

parcels, (2) actual sales, and (3) the State equalization rate. The 1978 amendment failed to effect any change in the statutory language that would require parcels to be selected or actual sales to be reviewed from among class properties. Furthermore, the State equalization rate, which is a universal rate applied to all properties, was maintained as admissible evidence. In other words, the same statutory language that had always authorized inequality evidence based on assessment comparisons with unclassified property remained unchanged. Moreover, a 1977 amendment to subdivision 3 of section 720 of the Real Property Tax Law (L 1977, ch 888, § 2), which had included in the subdivision the only reference to property classification contained therein, was deleted by the 1978 amendment now under review.

As a result of the 1978 legislation, therefore, a real procedural and evidentiary disorder was created. A petitioner in an inequality proceeding had to plead inequality with all properties on the roll, as well as inequality with those similarly classified. On his proof, a petitioner could present evidence as to each of these issues, but, of course, if he did, he either proved too much or too little, or both. And, if the last, then he would have proven the elements for two exclusive recoveries, without knowing which one he could rightfully claim.

Such a result is, of course, absurd, and, by the rules of statutory construction, must be avoided (McKinney's Cons Laws of NY, Book 1, Statutes, § 145; *Smith v People*, 47 NY 330). Moreover, it must be presumed that such a result was never intended by the Legislature (McKinney's Cons Laws of NY, Book 1, Statutes, § 145).

By applying the rules of statutory construction and by reviewing the Legislative history of chapter 476 of the Laws of 1978, the Legislature's intent in enacting subdivision 3 of section 307 of the Real Property Tax Law becomes clear. It is this intent which is the primary consideration in ascertaining the meaning and effect of any statute (McKinney's Cons Laws of NY, Book 1, Statutes, § 92).

The natural and obvious meaning of the language of subdivision 3 of section 307 (see McKinney's Cons Laws

of NY, Book 1, Statutes, § 94) indicates that assessment inequality petitions must allege inequality based on class comparison. If this provision is read in conjunction with section 706, as it must be (see McKinney's Cons Laws of NY, Book 1, Statutes, § 97), the result is an apparent conflict in pleading requirements, as discussed above. Consequently, a harmonious reading of the Real Property Tax Law becomes impossible. Harmony is achieved (see McKinney's Cons Laws of NY, Book 1, Statutes, § 98), however, when subdivision 3 of section 307 is interpreted as repealing that portion of section 706 which merely required an allegation of inequality based on a comparison with properties on the same assessment roll, without reference to their classification. If legislative intent controls, as it does (see McKinney's Cons Laws of NY, Book 1, Statutes, § 392), this repeal by implication will be dictated. The whole spirit of subdivision 3 of section 307 is that pleading requirements are being changed and more narrowly defined. This is firmly supported by legislative memoranda urging enactment of this statutory provision. For example, the memorandum in support of the Assembly bill reads, in relevant part: "[The new law p]rovides that in alleging inequality, petitioner must show that his property is assessed at a higher proportionate value than properties of the same major type on the same assessment roll * * * This Bill would Alter [present law.] Presently, a petitioner must show that the property is assessed at a higher proportionate value than all other properties not merely similar properties." I must conclude, therefore, that subdivision 3 of section 307 was intended to introduce new pleading requirements that superseded those in section 706, and to that extent, contrary provisions of section 706 were repealed.

Similarly, to the extent that subdivision 3 of section 307 changed and more narrowly defined the requisite allegation of assessment inequality in such a proceeding, it necessarily refined the meaning and effect of subdivision 3 of section 720. For in revising pleading requirements in an assessment proceeding, the Legislature must have intended that the nature of the evidence to be presented in proof thereof would concomitantly change. Once again, therefore, in reading the Real Property Tax Law as a whole and in attempt-

ing to harmonize all of its parts, I must conclude that the over-all effect of chapter 476 of the Laws of 1978 was to maintain the three types of evidence authorized by subdivision 3 of section 720, but to restrict their use in assessment inequality proceedings to proving comparison with similarly classified property. Thus, after 1978, a petitioner could only show actual sales and select parcels of property of the same major type as that under review. Furthermore, the State equalization rate, as a universal rate, could no longer be used. Instead, the more appropriate class rate could be proven, even though the SBEA has categorically denied the existence of such class rates. (See Memorandum to the Governor from counsel to the SBEA, disapproving L 1978, ch 476, as quoted by Special Term, *Matter of Slewett & Farber v Board of Assessors of County of Nassau*, 97 Misc 2d 637, 649.) Nevertheless, at Special Term, the county suggested that such class rates for major type property may be extracted from data and information on file with the SBEA. It must be implied, therefore, that the 1978 legislation replaced the State equalization rate as admissible evidence under subdivision 3 of section 720 with evidence of SBEA's class data as proof of a class rate. For only the latter would be relevant evidence consistent with the 1978 pleading changes.

The foregoing is an explanation of my understanding of the procedural and evidentiary scheme in assessment inequality proceedings established by and resulting from chapter 476 of the Laws of 1978. Given this understanding, it is patently clear to me that the Legislature in 1978 intended a basic revision in the very nature and purpose of such a proceeding and, consequently, in the claim presented and the recovery sought therein. No longer could a taxpayer claim an unequal assessment as compared to all other taxpayers. No longer could he seek to recover a refund because a tax levy had cast on him an unequal share of the total burden of all taxpayers. By reason of chapter 476 of the Laws of 1978, he could only claim and recover a refund representing his payment of an unfair share of the tax burden of similarly situated property owners. Thus, by implication a property tax by property type, class, or category was established, and, by procedural and evidentiary revisions

governing assessment inequality proceedings, this new tax structure was imposed.

Convinced that subdivision 3 of section 307, in effect, created a new and different property tax from that previously imposed, I must agree that subdivisions 4 and 5 of that section authorizing an unlimited retroactive application of subdivision 3 to all pending assessment proceedings renders all three subdivisions (3, 4 and 5) unconstitutional.

I would add that subdivision 3 effects a substantive change in New York's property tax structure. It does so by way of implication in a statute facially concerned with pleading requirements. As a result, there is authorized an inherently vague, indefinite, inconsistent and unpredictable tax, though one of major import, considering its almost universal application. Such a tax by property type or category, absent any specifications of the various types or categories contemplated, and absent procedures (presumably administrative) for their establishment based on clear statutory definitions, necessarily lacks uniformity and equality. Thus, property owners are deprived of substantive due process and equal protection of the laws. For this reason, subdivision 3 of section 307 cannot be constitutionally sustained.

I also agree that the 1979 amendment to the Real Property Tax Law adding section 721 (L 1979, ch 127), is unconstitutional in that it violates petitioners' equal protection rights under the Fourteenth Amendment to the United State Constitution.

Justice LAZER so ably sets forth the criteria by which courts determine the appropriate test for weighing the constitutionality of statutes under an equal protection analysis. He concludes that since the statutes under review do not discriminate against any persons by way of suspect classification nor affect any fundamental right guaranteed by the Constitution, the traditional "rational basis test" should be employed herein, rather than that of "strict scrutiny".

I cannot question his reasoning or conclusion in this regard, nor his ultimate conclusion that under the rational basis test section 721 of the Real Property Tax Law must be declared unconstitutional.

I would, however, emphasize one point. Section 721 can be viewed as affording residential property owners an evidentiary method of proving unequal assessments (i.e., the State equalization rate) which is denied to all others by section 720. Admittedly, this method is an easier, more expedient, and more inexpensive way of proving inequality. Thus, considered in this context, the 1979 amendments of the Real Property Tax Law can be said to streamline assessment review proceedings for some taxpayers (§ 721) and not for others (§ 720). The discriminating factor is the type of property under review, i.e., residential or nonresidential. Only the owners of the former will benefit from this streamlining. Whether there can exist no rational basis for this differential treatment seems difficult to decide, considering the many distinguishing features between these two different groups of property owners.

Nevertheless, when sections 720 and 721 are read together and in conjunction with section 720 as it had previously read (L 1978, ch 476, § 2), their net effect, in reality, is not to discriminate between residential and nonresidential property owners by *giving* the former an evidentiary right not given the latter. Rather, by denying the use of the State equalization rate to nonresidential property owners, the effect is to *take away* from this one group of property owners a method of proof previously available to all property owners. In this context, I note the legislative history of chapter 126 of the Laws of 1979 which clearly reveals that the State equalization rate had been found per se to be a wholly inappropriate method of proving assessment values for taxing purposes. In fact, such evidence was characterized as "spurious and counter-productive". Since, therefore, the availability of this irrelevant evidence is only withheld from one distinct group of property owners, the combined effect of sections 720 and 721 is completely irrational. If a certain type of evidence is deemed irrelevant to the proof of a certain fact, the identity of the person employing such evidence will not alter the irrelevant nature of the evidence.

Therefore, I concur in declaring section 721 of the Real Property Tax Law unconstitutional.

Finally, I turn to what the plurality opinion by Justice LAZER calls the ultimate infirmity in this matter.

The plurality decides that subdivision 3 of section 720 (as amd by L 1979, ch 126) is strictly an evidentiary statute. Its retroactive application to pending proceedings does not, therefore, divest litigants therein of any vested rights because it has retrospectively denied them the use of the State equalization rate to prove the ratio of assessment value to full market value of their properties. As stated (p 213), "there is no right to have a controversy determined by a previously existing rule of evidence". Moreover, the plurality concludes that based on the limited record in the case at bar, it cannot be held that the alteration of evidentiary rules made by subdivision 3 of section 720 has totally deprived tax review petitioners of their remedy for obtaining a tax refund. Since the statute seems to maintain two other apparently viable methods of proof (selected parcels and actual sales) to sustain a tax review petition in an assessment inequality proceeding, taxpayers are accorded a sufficient remedy for obtaining such a refund upon a rightful claim. Thus, on the issues of vested rights and inadequate remedy, the plurality holds that subdivision 3 of section 720 meets constitutional due process standards. I concur.

The plurality then holds that despite its conclusion that subdivision 3 of section 720 is constitutional, it may not be constitutionally applied to petitioners herein. It concludes that, pursuant to former subdivision 3 of section 720, petitioners have obtained a determination at Special Term fixing the ratio of assessed value to full market value of the property now subject to review, based solely on proof of the State equalization rate for Nassau County for 1977/78. That determination, denominated an order granting partial summary judgment, is considered by the plurality to be an interlocutory judgment, and is viewed as being final in nature with regard to the adjudication of the fact of assessment to market value ratio. I disagree with this view and, to that extent, I dissent.

Critical to a discussion of this issue is a clear understanding of the nature and effect of a judgment.

CPLR 105 (subd [k]) contains the following definition: "The word 'judgment' means a final or interlocutory judg-

ment." CPLR 5011 expands on this rather sparing definition, stating that, whether final or interlocutory, a judgment, to be a judgment, must constitute a *"determination of the rights of the parties* in an action or special proceeding" (emphasis added). "More particularly it is a judicial determination that, on matters submitted to a court for decision, a *legal duty* or *liability* does or does not exist, or that, with respect to a claim in suit, *no cause of action exists* or that *no defense exists."* (49 CJS, Judgments, § 1; emphasis added; see, also, *Wood v City of Salamanca,* 289 NY 279, 282.) If final, the judgment will dispose of the entire litigation before the court, both as to subject matter and parties. (49 CJS, Judgments, § 11, subd a; 5 Weinstein-Korn-Miller, NY Civ Prac, par 5011.03.) If interlocutory, it will be "an intermediate or incomplete judgment, where *the rights of the parties* are settled but something remains to be done." *(Cambridge Val. Nat. Bank v Lynch,* 76 NY 514, 516; emphasis added; see, also, *Buffalo Elec. Co. v State of New York,* 14 NY2d 453, 458; *Matter of Anonymous,* 71 Misc 2d 943, 944.)

It is apparent, therefore, that the unique feature of the judicial act of rendering judgment is the determination of the rights of parties, whether partially or in their entirety. (See *Towley v King Arthur Rings,* 40 NY2d 129, 132.)

In *Sherman v Jacobson* (247 F Supp 261) and *Lummus Co. v Commonwealth Oil Refining Co.* (297 F2d 80, cert den *sub nom. Dawson v Lummus Co.,* 368 US 986), both cases cited by the plurality, the issue was whether a judgment by another court was final enough to preclude, by collateral estoppel, relitigation of the same issue in a subsequent case.

In *Sherman v Jacobson (supra,* p 265), an action to collect the proceeds of seven notes, it was determined that another court had previously entered judgment, based on findings of fact "totalling about twelve legal-size pages and conclusions of law of one page * * * [The other court] found, *inter alia,* that Sherman had purchased the notes and mortgages in good faith and for value in the ordinary course of business and before they were due, that Jacobson failed to establish his affirmative defenses, that each note of Jacobson sued upon by Sherman here is a valid subsisting

obligation of Jacobson, that each note is now in default, and that the principal as claimed by Sherman is due and owing to him, plus interest from the date of each note according to its terms." The *Sherman* court (p 270) held, therefore, that the foregoing was final enough for the application of collateral estoppel to the issue of the validity of the notes.

In *Lummus Co. v Commonwealth Oil Refining Co. (supra)*, a trial court had entered an order for a preliminary injunction staying arbitration of a dispute based on contract. This order was accompanied by a finding that a substantial issue existed as to whether the contract containing the arbitration clause was the result of fraud in the inducement (p 83). On appeal the trial court was reversed on a finding that no such issue of fraud existed and the stay of arbitration was vacated (pp 83-84). In *Lummus (supra,* pp 89-90), it was therefore held that regarding the issue of fraud, the prior appellate determination constituted a judgment final enough to preclude further litigation of that issue.

In each of these Federal cases, it is important to recognize that whether a prior judgment had been rendered was not in question. Instead, it was whether the judgment rendered was final enough in the context of collateral estoppel. (See, also, *Bannon v Bannon*, 270 NY 484, 490.) It was assumed, therefore, that a judgment had been rendered, and such an assumption was altogether appropriate. For in both *Sherman* and *Lummus (supra)*, the prior judgments in question had settled certain rights as disputed by the parties, viz., the right to collect on notes in default and the right to enforce an arbitration clause in a contract.

In each case, then, an ultimate fact was proven upon which "the law makes the occasion for imposing its sanctions". *(The Evergreens v Nunan,* 141 F2d 927, 928.) In each case, a right was established which became enforceable and capable of execution. (See, e.g., *Stigwood Organisation v Devon Co.,* 44 NY2d 922.) In each case, a judgment was rendered.

In the case at bar, the threshold issue, therefore, is whether any judgment was rendered by reason of Special Term's order granting summary judgment on the issue of

assessment ratio for 1977/78. Or was the order mislabeled a judgment?

The order reads, in relevant part: "Ordered, Adjudged and Decreed that the State Board of Equalization and Assessment having determined that the state equalization rate for Nassau County for the 1977/78 tax year (tax status date May 1, 1977), is 15.80%, the ratio for the 1977/78 tax year is hereby determined to be 15.80% for the purposes of this proceeding only." Although viewed by the plurality as an interlocutory judgment, and denominated partial summary judgment, this order constitutes nothing more than a finding of fact. It did not settle or determine any of the rights of the parties as to the ultimate issues in controversy, viz., inequality of assessment, overpayment of taxes due to inequality and the amount of refund due to overpayment. No claim, or part thereof, was sustained, nor defense dismissed. No right was established that could be enforced. No judgment was rendered that could be executed. The order appealed from simply decided an evidentiary fact, "which is indifferent in itself, does not disclose its bearing upon the legal relationship in controversy, and is introduced by a party solely for the purpose of proving another fact, the latter fact, because it involves a material element of the legal relationship in controversy, being the ultimate fact" (Ann., 152 ALR 1193).

I am convinced that, by the order appealed from, petitioners were not granted partial summary judgment, but an order limiting issues of fact for trial, pursuant to CPLR 3212 (subd [g]). As part of that order, the fact of the assessment ratio for 1977/78, as based on the State equalization rate for that tax year, was determined.

The real issue, then, is not whether petitioners have a vested right in an interlocutory judgment, but whether they can be said to have a vested right in a finding of an evidentiary fact.

It could be argued that, although the fact of ratio as already proven gives petitioners no substantive right, by reason of its proof alone, there exists, per se, a right to the fact itself. That is, even if the order appealed from is deemed one limiting fact issues for trial, such an order

would have to be read, pursuant to CPLR 3212 (subd [g]), as "establish[ing] for all purposes in the action" the fact that the assessment ratio, based on the State equalization rate, is 15.80%. Can the Legislature, therefore, retroactively change or abolish this fact or deprive petitioners of it?

The answer to this question is another question, viz., was a fact changed or abolished by the 1979 legislation or taken from petitioners? I answer this in the negative.

As so ably explained by the plurality, chapter 126 of the Laws of 1979 represents a strictly procedural revision in the manner by which assessment inequality claims are prosecuted. By retroactive application of the amended subdivision 3 of section 720, petitioners in tax review proceedings still pending, who have not as yet proven inequality, an ultimate fact in any such proceeding, are now required to do so by the select parcels or actual sales methods only. Thus, if evidence of this type is not offered, a claim of inequality cannot be sustained.

In the case at bar, petitioners have not proven inequality, but have merely proven the evidentiary fact of ratio based on the State rate. This fact was not changed or abolished or taken away from petitioners by the Legislature in 1979. It remains a proven fact. As such, petitioners are free to rest on it in proof of the ultimate fact of inequality. However, such a position would be fatal, since the Legislature, in the exercise of its unique power to regulate procedure (9 NY Jur, Constitutional Law, § 248), has established evidentiary requisites for sustaining inequality petitions, which would not be fulfilled by proof of ratio based on the State rate alone. That which petitioners have already proven, then, is not declared nonexistent by the Legislature, but insufficient to sustain their claim, the ultimate issues of which remain *sub judice*. Petitioners, therefore, having obtained no rights enforceable against the county[1] as a result

---

1. The plurality also sees another divestiture of property rights in the retroactive application of the current version of subdivision 3 of section 720. They hold that since petitioners herein have proven ratio by evidence of the State rate, if ratio so proven is subsequently deemed irrelevant on the ultimate issue of inequality, petitioners' cost in proving such ratio would not be reimbursable

*(n. contd.)*

of the instant petition, may still prosecute their pending claim, but must do so according to currently applicable procedure.[2]

Accordingly, I dissent in part, to the extent that I vote to declare the retroactive application to petitioners of subdivision 3 of section 720 of the Real Property Tax Law to be constitutional.

COHALAN, J. (concurring in part and dissenting in part). I concur in the affirmance of the order at Special Term.

I dissent from the plurality opinion only to the extent that it would reach and determine the constitutionality of the 1979 legislation which was not in existence at the time the trial court rendered the determination presently under review.

Despite the allusion in the plurality decision to the confusion concerning the applicable law and the acquiescence of the parties in our court's review of the 1979 legislation, such action in my view would violate a basic principle of appellate review, i.e., that issues, particularly those of constitutional dimension which were never argued or determined at the trial court level, cannot be raised for the first time upon appeal. This fundamental rule has been relied upon in recent years in three of the four departments of

under section 716 of the Real Property Tax Law. I note, however, that on this record petitioners would not be eligible for any reimbursement. There is no indication that a demand for admission was served upon the county in accordance with subdivision 1 of section 716. Failure to serve such a demand prior to proof of ratio would preclude an award of reasonable fees (see Real Property Tax Law, § 716, subd 2).

Nevertheless, even if petitioners had acted in accord with section 716, proof of ratio based on State rate creates such a minimal cost that a right to reimbursement would be one controlled by the maxim *de minimis non curat lex*. Moreover, section 716 was enacted in 1958 (L 1958, ch 959) when proof of ratio by the State rate was unavailable to tax review litigants. Obviously, then, it was intended to relate to the costlier methods of selected parcels and actual sales then available. These methods are again the only methods available. Since trial has not as yet commenced herein, a demand under 716 can be timely served, and, if the other requirements of 716 are met, petitioners will be eligible for reimbursement of the reasonable expenses incurred in proving assessment ratio.

2. As shown by the plurality this procedure neither denies the right to which the remedy relates nor makes it impossible to proceed to judgment thereon. (See 9 NY Jur, Constitutional Law, § 249.)

the Appellate Division *(Emmer v Emmer*, 69 AD2d 850 [2d Dept—attack on constitutionality of section 237 of the Domestic Relations Law] ; *Eisen v Eisen*, 59 AD2d 521 [2d Dept—attack on constitutionality of sections 32 and 240 of the Domestic Relations Law] ; *Matter of Gary A.*, 60 AD2d 927 [3d Dept—attack on constitutionality of section 1039 of the Family Court Act] ; *Colenzo v Kernan*, 49 AD2d 809 [4th Dept—attack on constitutionality of the no-fault insurance law]).

The importance of requiring the development of a full trial court record before appellate review of a statute's constitutionality may take place is emphasized in the present case where a majority of this court would strike down the residential exemption contained in section 721 of the Real Property Tax Law because it can find no rational connection between such exemption and any valid legislative purpose. If this issue had been litigated in the trial court, the proponents of the law would at least have been afforded the opportunity of proving the existence of such connection, possibly by offering evidence of the problem which the statute was intended to correct. In the absence of any trial record on this entire issue, the majority is reduced to examining the brief statement of legislative purpose contained in the statute itself. This procedure would appear less than adequate in dealing with an issue of such State-wide magnitude.

Moreover, the procedure employed here, purportedly in the interest of judicial economy, would appear to violate the oft-quoted judicial maxim that courts will avoid passing on a constitutional question if there is any other way of disposing of the case (McKinney's Cons Laws of NY, Book 1, Statutes, § 150). This court could quite easily affirm on the opinion at Special Term, leaving the 1979 legislation for another day and a more complete record. The argument that appellate courts decide the law as it stands when it reaches them is generally true. However, in most such instances, a public hearing on due notice is held so that aggrieved persons may be afforded an opportunity to be heard. Such was not the case in the action of the State Legislature with respect to the 1979 laws at issue.

Finally, as Chief Justice MARSHALL remarked in *McCulloch v Maryland* (4 Wheat [17 US] 316, 431), "the power to tax involves the power to destroy". The plurality speaks of a procedural or evidentiary change effected by the Laws of 1979, but as to the residential taxpayer, if deprived of the equalization method in a tax certiorari case the law as to him is substantive and the resulting expense not only prohibitive, but also destructive of his rights.

O'CONNOR, J., concurs with LAZER, J. P.; MANGANO concurs in part and dissents in part in an opinion; COHALAN concurs in part and dissents in part in an opinion.

Order modified, on the law, by adding decretal paragraphs (1) declaring section 721 of the Real Property Tax Law unconstitutional and (2) declaring subdivision 3 of section 720 of the Real Property Tax Law constitutional. As so modified, order affirmed insofar as appealed from, without costs or disbursements.