FRIARTON ESTATES CORP., BWIT Fifty Fifth Street, Inc., and Mid-Central Properties, Ltd., Plaintiffs,

v.

The CITY OF NEW YORK, Philip R. Michael, as Commissioner of Finance of the City of New York, and Tax Commission of the City of New York, Defendants.

No. 81 Civ. 3022–CLB.

United States District Court,
S. D. New York.

Oct. 2, 1981.

Richard Givens, Gina Schachter, Martin Fine, Botein, Hays, Sklar & Herzberg, New York City, for plaintiffs.

Allen G. Schwartz, Corp. Counsel, By: Judah Dick, Morris Einhorn, New York City, for defendants.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

By their complaint filed May 19, 1981 and by order to show cause filed May 20, 1981, plaintiffs seek preliminary and permanent injunctive relief preventing defendants from transferring to the City of New York title to and possession of, several of their properties, pursuant to Amended Supplemental Judgments of Foreclosure in rem entered on May 20, 1980 in the Supreme Court, New York County. Plaintiffs also seek damages from the City of New York to redress alleged violations of rights secured to plaintiffs by the Constitution of the United States and 42 U.S.C. § 1983.

Subject matter jurisdiction is predicated upon 28 U.S.C. § 1343(3) to redress the deprivation, under color of state law, of rights secured to plaintiffs by the Constitution of the United States and by 28 U.S.C. § 1331, because the case arises under the Constitution and laws of the United States.

Plaintiffs' underlying claim is that their properties have been assessed unequally and overassessed improperly for purposes of real property taxation. They also claim to suffer from a "multi-dimensional squeeze" wherein the income from the properties is restricted by rent control and rent stabilization, while expenses are increased by required "essential" services, and the real property tax assessment does not reflect this limited profit margin. They allege that they have made consistent and repeated efforts to obtain a trial on the merits of these claims in tax certiorari proceedings and in the foreclosure action, but they have been deprived of a day in state court for seven years, by means of various procedural obstructions imposed by the City. The City now threatens to convey title from plaintiffs to itself pursuant to proceedings in the nature of in rem tax foreclosure discussed below. Plaintiffs seek to have this Court prevent such conveyance, pending a trial on the merits of plaintiffs' tax certiorari cases.

This Court has reviewed the state court record in the related actions and held hearings in this action on May 20, 1981, May 27, 1981 and June 10, 1981. No testimony was taken at these hearings because the essential facts are undisputed. For reasons stated below, we find that the complaint states a claim; plaintiffs are entitled to a preliminary injunction to protect their ownership; and an order of abstention should be made in this action.

## I

Plaintiff Friarton Estates Corp. is the present owner in fee of premises known as Block 735, Lot 30 [1] and Block 1042, Lots 2,

---

1. This property, apparently improved by nine small apartment houses is located on 9th Avenue between 37th and 38th Streets, in Manhattan. Ex. B to Complaint. This is a blighted urban area, now in transition from ancient small tenements to a center of convention ac-

3, 4, 5, 6, 7 and 64 [2] on the tax map of New York County (hereinafter the "properties"). Plaintiffs BWIT Fifty-Fifth Street, Inc. and Mid-Central Properties, Ltd. are the former owners and present mortgagees of the properties and are the predecessors-in-interest to plaintiff Friarton. As such they have a possible financial interest in the state court certiorari cases. Friarton, BWIT and Mid-Central (hereinafter "plaintiffs", sometimes referred to collectively for convenience as "Friarton") collectively represent ownership of the properties since 1973. Apparently, some of the properties are empty lots and some are improved with old apartment buildings, which are subject to New York City's rent control and/or rent stabilization laws. *New York City Admin. Code* §§ Y51–1.0 *et seq.* and YY51–1.0 *et seq.* Defendants are the City of New York, Philip R. Michael in his capacity as Commissioner of Finance of the City of New York,[3] and the Tax Commission of the City of New York [4] (collectively the "City").

Beginning in 1973, plaintiffs brought tax certiorari proceedings in the New York State Supreme Court, New York County, pursuant to *N.Y.C.Admin.Code* § 166–1.0. Such proceedings were filed for each fiscal year from 1972–73 through 1980–81, inclusive, seeking review and correction of the assessed valuations of the properties. Specifically, plaintiffs sought reduction of the assessed valuations of the properties on the separate statutory grounds of over-valuation, and unequal assessment in proportion to similar properties.[5] Plaintiffs claimed that the assessed valuations were fixed·in disregard of large operating losses allegedly incurred with respect to each parcel, which made it impossible to pay the property taxes imposed by the City out of net revenues of the properties. Plaintiffs claim that their revenues are severely and arbitrarily limited by the City as a result of rent control and rent stabilization,[6] and that they are also required under those laws to provide numerous "essential" services under threat of substantial civil and criminal penalties. Plaintiffs also claimed that the assessments are many times greater than fair market value, which value is properly evidenced by the arms-length transactions in

tivity and supporting services. The New York City Convention and Exhibition Center is now under construction nearby, on a site bounded by 11th and 12th Avenues between 34th and 39th Streets.

2. This property is apparently improved by six small apartment houses located on 9th Avenue between 51st and 52nd Streets, in Manhattan. Ex. B to Complaint.

3. Commissioner Michael's responsibilities include the preparation, execution and recording of deeds conveying to the City title of properties foreclosed in rem for failure to pay real property taxes. In such deeds the Commissioner is the grantor and the City is the grantee. Complaint, ¶ 12.

4. The responsibilities of the City Tax Commission under New York City Charter § 153(b) include the review and administrative correction of assessments of real property within the City of New York. Such administrative remedy must be sought prior to filing a judicial proceeding (tax certiorari petition). N.Y.C. Charter § 163 (Supp. 1980–81); Complaint, ¶ 13.

5. Under *N.Y.C.Admin.Code* § 166–1.0 there are three grounds upon which real property tax assessments can be challenged: (1) illegality, in that the property was exempt from real property taxation or that it was placed improperly on the tax rolls (plaintiffs did not challenge their assessment on this ground); (2) over-valuation, or erroneous assessment, in that the assessment exceeds the net value of the property (net value being the total of land value and reproduction cost of the building, less depreciation and obsolescence) (3) inequality, in that the "assessment is erroneous . . . in that it has been made at a higher proportionate valuation than the assessment of other real property of like character in the same ward or section, or other real property on the assessment rolls of the city for the same year." *Id.* See Tr. of Hearing, June 10, 1981, at 14-17; *Slewett & Farber v. Bd. of Assessors*, 438 N.Y.S.2d 544, 550 (App.Div.2d Dept.1981) (explaining inequality only).

6. Plaintiffs' rents appear extremely low by metropolitan standards. Of eighty-six apartments, the average rent is just over $97.00 per month; the lowest rent is $38.20 and the highest rent is $158.22. See Ex. B to Complaint.

which Friarton recently purchased the properties from its predecessors.[7]

A tax certiorari proceeding pursuant to *N.Y.C.Admin.Code* § 166–1.0 is the only judicial remedy available under New York law to property owners in New York City to obtain relief from excessive or confiscatory real property tax assessments. Plaintiffs claim that they have, since 1973, made diligent efforts to obtain a trial on the merits of the assessment dispute by bringing the necessary tax certiorari proceedings. They claim, however, that the City has frustrated their efforts through a variety of intentionally evasive and delaying tactics which seek only to avoid a fair and prompt resolution of this dispute.

The State Supreme Court within this City maintains separate trial calendars for each of the three types of tax certiorari proceedings. Apparently, and the record is unclear on this point, cases such as this, where both over-valuation and inequality claims are made are either all placed on the inequality calendar, or required to be tried on the inequality issue prior to trial on the over-assessment issue. Plaintiffs claim, and the City does not dispute this, that not a single case from the so-called inequality calendar has been reached for trial in more than five years. (Complaint, ¶ 17(a) and (b); Transcript of Hearing of May 27, 1981, at 7). Plaintiffs have on numerous occasions requested a trial of these claims, but the City,

with the acquiescence of the State Court, has either refused, or conditioned its agreement to trial of the over-valuation claim upon plaintiffs' waiving or abandoning their inequality claim. (Complaint, ¶ 17(d); Affidavit of George Peters, May 19, 1981, at 6, quoting Affidavit of Asst. N.Y.C. Corporation Counsel).[8]

On July 6, 1977, the City instituted *In Rem Foreclosure Action No. 29* in the New York State Supreme Court, New York County to foreclose tax liens on all parcels delinquent in payment of property taxes, water charges and sewer rents for one or more years, including plaintiffs' properties described in the complaint in this action.[9]

Pursuant to *N.Y.C.Admin.Code* § D17–11.0 [10] which permits the pleading and establishment of the affirmative defense of invalidity of the tax in an in rem foreclosure action, Friarton sought to raise defenses in *In Rem Foreclosure Action No. 29* based upon: (1) over-valuation; (2) inequality of assessment; (3) denial of due process because of the unavailability of a trial on the merits of their tax certiorari claims; (4) deliberate delays by the City; and (5) failure in determining assessed valuations to consider the impact of the City's rent control and rent stabilization restrictions combined with required "essential" services. Friarton also presented two overlapping counterclaims in the in rem foreclosure case. The first counterclaim repeated the

---

7. All eight parcels had been acquired by Friarton for nominal prices and subject to tax arrears from one or both of the other plaintiffs, one month prior to the commencement of *In Rem Foreclosure Action No. 29.*

8. The City claims that plaintiffs delayed filing "Notes of Issue" required to place these matters on the tax certiorari trial calendars. (City's Memorandum of Law filed June 10, 1981 at fn. pp. 4–5). *This claim is specious* since the earlier filing of Notes of Issue would not have obtained a trial for plaintiffs. See Complaint, ¶ 16; Pltf's Memo of Law filed May 20, 1981 at 7–8; Tr. of Hearing of June 10, 1981 at 6–7, 13–14.

9. Subsequently, as to their seven parcels which are located in Block 1042, plaintiffs were granted a 22% reduction in property tax assessments for 1977–78 and 1978–79, *i. e.,* from $580,000 to $452,000, as the result of an admin-

istrative hearing before the defendant Tax Commission. Accordingly, they withdrew their tax certiorari petitions for those parcels for those years. Six other parcels originally involved in *In Rem Foreclosure Action No. 29,* having negligible outstanding tax arrears (less than $2,000) were removed from the foreclosure by agreement. These properties are therefore not involved in this action.

10. *N.Y.C.Admin.Code* § D17-11.0 provides in part:

"A defendant alleging any jurisdictional defect or invalidity in such taxes, assessments or other lawful charges or in the foreclosure thereof must particularly specify in his answer such jurisdictional defect or invalidity and must affirmatively establish such defense."

claim that the City has failed to consider the impact of rent control and rent stabilization restrictions when combined with required "essential" services, in determining assessed valuations, and added that this amounted to a taking of property without compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution and the Constitution of the State of New York. Plaintiffs sought One Million Dollars damages under this counterclaim. The second counterclaim alleged that the assessments of the properties are over-valued and that they will be substantially reduced in the tax certiorari proceedings (if those proceedings are ever tried on the merits), and that foreclosure was, therefore, improper and premature.

By a decision of August 29, 1979, rendered without an evidentiary hearing, the New York State Supreme Court Justice presiding found no merit in three of plaintiffs' defenses as a matter of state law. As to the remaining defense he held that: "It would, of course be inequitable to allow In Rem foreclosure ... if in fact the taxes were improperly over-assessed and if defendant did not have a reasona-

ble opportunity to obtain a proper assessment. Such a transfer of title would be an unconstitutional taking of property without compensation."

However, on the face of the pleadings and affidavits, the state court, notwithstanding its holding quoted above that foreclosure was inequitable prior to trial of the tax certiorari case, granted summary judgment for the City. The state court held that plaintiffs' counterclaims, which "may have merit," were not permitted in an in rem foreclosure action under *N.Y.C.Admin. Code* § D17–9.0(d).[11] Accordingly, he ordered the counterclaim severed.[12] On December 27, 1979 the state court denied reargument, holding that: "Insofar as they [Friarton] raise procedural due process questions," these issues were "mooted" because of the failure to accept a "Settlement Offer" apparently tendered by the City.[13]

Friarton appealed, and the Appellate Division, First Department, affirmed without opinion on August 31, 1979 with leave to appeal denied. On May 20, 1980 the state court issued Amended Supplemental Judgments of Foreclosure for each block. Plaintiffs then appealed to the New York State

11. *N.Y.C.Admin.Code* § D17–9.0(d) provides "No counterclaim may be asserted in an answer interposed in an action brought pursuant to this title. Where a counterclaim is asserted in an rem answer the city may disregard that portion of the answer and shall suffer no legal penalty or impediment in the prosecution of its in rem action for its failure to reply or respond thereto. Where an answer contains only a counterclaim and no other defenses the city may proceed to judgment of foreclosure against the property affected without the need for moving against the answer."

12. Friarton served an "Answer and Counterclaims" in the state court and then sought permission to serve an amended answer. The original answer presented two overlapping counterclaims; the amended answer presented only the second counterclaim. In its decisions of August 29, 1979 and in its Amended Supplemental Judgments of Foreclosure of May 15, 1980, one for each Block, the Supreme Court granted the amendments in part and denied them in part. The court stated that: "Defendant's counterclaims which are not permitted in an in rem tax foreclosure pursuant to Section D17–9.0(d) of the Administrative Code of the City of New York, shall be severed and contin-

ued in a separate action. . . ." It must be noted that this sentence was changed by hand by the Justice presiding from the singular to the plural, thereby emphasizing his intent that *both* of the overlapping counterclaims survived his decision and were severed. On oral argument before this Court the City admitted that "[t]hose cases [the counterclaims] were severed. They are intact on the calendar." Tr. of Hearing, June 10, 1981, at 11.

13. This conclusion is unexplained, and was apparently reached without an evidentiary hearing. No citation of authority was set forth to support the notion that a litigant can "moot" or lose due process rights of constitutional magnitude by a refusal to accept a "Settlement Offer" in a litigation, and this Court knows of none. Evidence of conduct or statements made in compromise negotiations is generally not admissible. This includes evidence of rejection of a "Settlement Offer" by an opposing party. See Rule 408, F.R.Evid., believed by this Court to be consistent with New York law. Under all the circumstances, such a chance remark should not be regarded as an adjudication on the merits. See text p. 1258, *et seq.*

Court of Appeals as of right and that court dismissed on March 26, 1981 for want of a substantial constitutional question.

On April 30, 1981, the City moved for an order restoring and reinstating *nunc pro tunc* a June, 1980 deed by which the City had purported to convey the properties to itself in violation of a state court-ordered stay, which deed had been previously vacated pending a final determination of plaintiffs' appeal from the judgments of foreclosure. Plaintiffs cross-moved for an order relieving them from the judgments of foreclosure, staying enforcement of the judgments pending the determination of the pending tax certiorari proceedings, and directing immediate trials for dates certain in the tax certiorari proceedings. The principal basis for plaintiffs' cross-motion was a claim of newly discovered evidence.[14] By a memorandum decision of the Supreme Court, New York County, dated May 6, 1981, the City's *nunc pro tunc* application and plaintiffs' cross-motions were denied. The City is now permitted to file and record a deed to itself for the properties, unless enjoined by this Court.

We now consider the state of the tax certiorari cases. Just before the Appellate Division, First Department affirmed Special Term's decision, the City applied for and obtained a "blanket stay" of the entire inequality calendar. That application was made in an action by another taxpayer to which plaintiffs, as well as all the other parties on the inequality calendar, were not parties. No notice of the application for the stay was given to Friarton or to the other litigants having similar cases ready for trial. *See Freewalt Realty Corp. v. Finance Administrator*, N.Y.L.J., December 6, 1980, at 6, col. 6 (Sup.Ct.N.Y.Co., Dec. 2, 1980, not otherwise reported).[15] *See Colt Industries Inc. v. Tax Commission*, N.Y.L.J., Nov. 17, 1981 (App.Div. 1st Dept., Nov. 13, 1980) (per curiam).

As can be seen, plaintiffs' counterclaims, which were severed by the trial court on August 29, 1980, have remained non-justiciable in the state court to this day primarily because of the stay of the entire inequality calendar obtained by the City in *Freewalt*. In addition, plaintiffs allege other improper activity intended to produce delay, on the part of the City, which need not now be considered.[16]

**14.** That claim was based on a newspaper article. On April 24, 1981 the *New York Times* published a front page story entitled "Study for City Calls Realty Tax 'Hideously Inequitable'." According to the article a 457 page report commissioned by the New York City Department of Finance found that "inequalities cut across the board—between residential and commercial properties, between one borough and another, between one category of housing and another, even between two buildings that were the same except for location." The Mayor was quoted as having called the study's findings "unacceptable" and was stated to have refused to release the report to the public. The article was apparently the result of a leak and surely inadmissible as evidence, newly discovered or otherwise. But the underlying facts stated are probably true.

**15.** The following is the entire decision and order in *Freewalt*:
"The inequality calendar of this court in all respects is stayed pending final Appellate determination of *Colt Industries v. Tax Commission of the City of New York*, or further order of the Appellate Division."
This stay in *Freewalt* was granted, according to the affirmation supporting the City's appli-

cation for the stay, to prevent repetitive trials and appeals and to allow the Appellate Division and the Court of Appeals to resolve problems as to "the proper method for determining inequality and the degree of inequality, if any," in the pending appeals in the *Colt Industries* case, N.Y. Co. Index No. 58446/69 (leave to appeal granted June 11, 1981), and in *Equitable Life Assurance Society v. Tax Commission*, N.Y. Co. Index Nos. 56322/77 and 56323/77. See *40 Sutton Assoc. v. Finance Admin.*, App.Div. 1st Dept. (index number unknown) (approx. June 1981) [motion to vacate *Freewalt* stay denied prior to determination of *Colt* appeal by Court of Appeals].
None of the above cases are officially reported. It appears that the stay issued in *Freewalt* and the appeal in *Colt* arise from some quodlibet concerning the admissibility of evidence. Those interested in seeing how such an issue can confute the bench and bar, and subvert the administration of justice should see *Real Prop. Tax L.* §§ 306–07, 720–21, 1250–54 and *Slewett & Farber v. Bd. of Assessors*, 438 N.Y.S.2d 544, 549–55 (App.Div.2d Dept. 1981).

**16.** The City has allegedly refused to release official real estate sales records kept in its files which would be relevant evidence or "sales

Frustrated in their attempts to litigate these issues in the state courts, plaintiffs commenced this civil rights action on May 19, 1981. At the same time they moved by order to show cause for a preliminary injunction and temporary restraining order. Plaintiffs' complaint, patterned largely on their pending counterclaims severed in the foreclosure action, alleges that the procedural denial by the New York state courts of an opportunity to adjudicate their claims, the effect of rent control, and the City's conduct when taken as a whole, amounted to an unconstitutional taking of their property without compensation, in violation of the Fourteenth Amendment. The complaint further alleges that state judicial consideration of plaintiffs' over-assessment and inequality claims on the merits was denied on state procedural grounds in the *In Rem* proceeding, and that due to deliberate City-induced delays in the tax certiorari proceedings and the *Freewalt* stay (obtained by the City without notice to plaintiff nor any opportunity to be heard), of all trials on the entire inequality calendar, such consideration was also prevented in the tax certiorari proceedings.

The complaint alleges more particularly that in fact the properties were discriminatorily assessed at values far in excess of fair market value, without regard to the huge operating losses resulting solely from City rent restrictions and "essential services" requirements. Plaintiffs also claim that in order to obtain financing to pay the outstanding property taxes and thereby avoid foreclosure, it is essential for them to be able to inform any prospective lender or mortgagee of the exact amount of outstanding taxes and what the future taxes are likely to be.

By continuing to deny plaintiffs an immediate trial on the merits of all their tax assessment claims, a fact not disputed, the City deprives them, plaintiffs claim, of an opportunity to obtain funds to pay the outstanding amounts.

By notice of motion dated May 21, 1981, the City moved to dismiss under Rule 12, F.R.Civ.P. and for failure to state a claim, and for summary judgment under Rule 56, F.R.Civ.P., dismissing plaintiffs' complaint and denying all relief requested by plaintiffs on the grounds that the action is barred by (1) res judicata; (2) the Tax [Anti-] Injunction Act, 28 U.S.C. § 1341; and (3) by plaintiffs' failure to petition for certiorari to the United States Supreme Court from the adverse decision of the New York State Court of Appeals (*supra*, p. 1256).

In opposition to the motion for a preliminary injunction, in the event that its motion to dismiss is not granted, the City urges that injunctive relief be denied, notwithstanding plaintiffs' claims unless plaintiffs now pay the "undisputed" tax arrears, computed according to their allegations in the certiorari cases, pending a trial on the merits at some undetermined future date "after the stay of the Inequality Calendar of the Supreme Court in New York County is vacated." See Ex. B to Plaintiffs' Memorandum in Reply to Affirmation in Opposition to Interim Stay, at 2 (docketed August 27, 1981).

On July 23, 1981 this Court referred all proceedings in this matter to Hon. Leonard Bernikow, United States Magistrate, "for the purpose of conducting continued settlement discussions and to . . . hear and determine any and all requests for preliminary injunctive relief or temporary restraining orders or other provisional remedies . . . in order that the status quo of the subject matter of this lawsuit be maintained pending settlement or pending the resolution by this Court . . . of the motions heretofore submitted." On July 31, 1981, Magistrate Bernikow, doubtful of his power to do so, recommended that this Court issue an interim preliminary injunction to preserve the

---

data" to demonstrate inequality. Plaintiffs' Reply Memorandum, June 15, 1981, at 10. See Kihss, *City Won't Let Analysts See Real Estate Sales Data*, New York Times, Nov. 10, 1980 at B3. Plaintiffs say that they will challenge this refusal in the tax certiorari proceeding if they are ever successful in obtaining a trial. Plaintiffs Reply Memorandum, June 15, 1981, at 10.

This and similar charges of obfuscation hardly rise to Constitutional magnitude.

*status quo* pending decision of the motions submitted. This Court did not issue a temporary restraining order or an interim preliminary injunction because the City agreed on the record in open court to preserve the *status quo* in this action by not transferring a deed or otherwise attempting to divest plaintiffs of the properties, pending a decision of this Court on the pending motions mentioned above.

## II

■ It will aid our analysis to consider the issues raised by the City's motion first. The Court concludes that Friarton's claims are not barred in this Court under the *Rooker* doctrine [*Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415–16, 44 S.Ct. 149, 150, 68 L.Ed. 3621 (1923)], nor by *res judicata* or collateral estoppel. Under *Rooker* and its progeny, once a judgment has been rendered by a state trial court after due hearing, and has been affirmed by the state's appellate courts, the only resort is to the appellate jurisdiction of the United States Supreme Court. The federal district courts have no jurisdiction over a suit which collaterally attacks such a judgment on the merits, or seeks to review it as if on appeal. *Ellentuck v. Klein*, 570 F.2d 414, 425 (2d Cir. 1978); *Tang v. Appellate Division*, 487 F.2d 138, 141 (2d Cir. 1973), *cert. denied* 416 U.S. 906, 94 S.Ct. 1611, 40 L.Ed.2d 111 (1974).

■ Even as to claims based on alleged federal civil rights violations, "[f]ederal courts do not sit to review the determinations of state courts." *Ellentuck*, 570 F.2d at 425, *quoting Mitchell v. National Broadcasting Co.*, 553 F.2d 265, 273 (2d Cir. 1977).

■ However, by its terms, *Rooker* applies only if "the judgment was responsive to the issues." 263 U.S. at 415, 44 S.Ct. at 150. Accordingly, *Rooker* does not bar district court actions brought on issues not previously determined on the merits by the state court. *Id.*

■ Since plaintiffs' counterclaims were severed and continued as a separate action which has never reached trial or a determination on the merits, the state court judgment was not responsive to these issues, and *Rooker* does not bar this Court from addressing those issues.

■ Plaintiffs' claims pleaded here are not barred by *res judicata*, either under New York law or under the general federal case law of *res judicata*. The prior judgment in *In Rem Foreclosure Action No. 29* is not conclusive upon plaintiffs in this action because, "a prior state court proceeding cannot bar federal court consideration of matters which were not actually litigated and determined in that prior proceeding." *Winters v. Lavine*, 574 F.2d 46, 57 (2d Cir. 1978). *See* 1B *Moore's Federal Practice* ¶ 0.405[1] (2d ed. 1974). Since plaintiffs' counterclaims were severed and have never been tried or decided, they were clearly not "actually litigated and determined," *Winters, supra* at 57, and are not barred by *res judicata*.

■ Similarly, plaintiffs are not barred under the federal or New York doctrines of collateral estoppel. For collateral estoppel to apply, plaintiffs must have had a "full and fair opportunity" in the earlier litigation to address the legal and factual issues claimed to be decisive in the current action. *E. g., Winters, supra*, at 56; *Zdanok v. Glidden Co.*, 327 F.2d 944, 956 (2d Cir.), *cert. denied* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964); *Schwartz v. Public Admin.*, 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969). Federal district courts may, and indeed must, act "where state procedural law was inadequate to allow full litigation of a constitutional claim, and where state procedural law, though adequate in theory, was inadequate in practice." *Allen v. McCurry*, 449 U.S. 90, 100, 101 S.Ct. 411, 418, 66 L.Ed.2d 308 (1980), *citing Monroe v. Pape*, 365 U.S. 167, 173–74, 81 S.Ct. 473, 476–477, 5 L.Ed.2d 492 (1961). This rule is held by the Supreme Court to be "essentially the same as the important general limit on preclusion that already exists: Collateral estoppel does not apply where the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or

issue ...." *Allen, supra*, 449 U.S. at 101, 101 S.Ct. at 418.

Also, "for the doctrine of issue preclusion [*i. e.* collateral estoppel] to be applicable, the determination of the issue must have been necessary to the [prior] decision." *Winters*, 574 F.2d at 57, *quoting Lombard v. Bd. of Educ.*, 502 F.2d 631, 637 (2d Cir. 1974), *cert. denied* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975). *See* 1B *Moore's Federal Practice* ¶ 0.441[1]–[2]. Here, the critical point is that "the principle of collateral estoppel renders the prior judgment conclusive only as to matters necessarily litigated *and determined* in the prior proceedings." (Emphasis added). *Expert Electric, Inc. v. Levine*, 554 F.2d 1227, 1233 (2d Cir.) *cert. denied* 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977).

▌ Obviously, Friarton's counterclaims asserted in the Answer and the Amended Answer were not litigated or determined in the *In Rem Foreclosure* proceeding because they were severed, apparently as beyond the procedural scope of that proceeding under the New York City Administrative Code. Since these claims were not decided in state court, the City's additional argument that plaintiffs should have petitioned the United States Supreme Court instead of commencing this action is also invalid.

### III

▌ The Tax [Anti-] Injunction Act, 28 U.S.C. § 1341 (hereinafter "the Act") provides:

"The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under the State Law where a plain, speedy and efficient remedy may be had in the courts of such State."

The policies underlying the Act are stated to be twofold: (1) to eliminate unjust discrimination between citizens of the state and foreign corporations with respect to their ability to obtain federal injunctions prohibiting the collection of state taxes, and (2) to avoid disruption of the state taxing process by foreign corporations obtaining injunctive relief from the federal courts.

*Fulton Market Cold Storage Co. v. Cullerton*, 582 F.2d 1071, 1074–75 (7th Cir. 1978), *cert. denied*, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). *See Tramel v. Schrader*, 505 F.2d 1310, 1316 (5th Cir. 1975). The legislative history of the Act confirms that Congress never intended for the Act to "take away any equitable right of a taxpayer, *or deprive him of a day in court.*" (Emphasis added). 81 Cong.Rec. 1416 (1937); S.Rep.No.1035, 75th Cong. 1st Sess., p. 2 (1937).

The Act, by its very terms creates an exception to the limitation on federal jurisdiction for cases where the state legislatures and courts have failed to make available to the taxpayer a "plain, speedy and efficient remedy."

▌ In determining what is a "plain, speedy and efficient remedy," the Supreme Court has held that the "basic inquiry" is "whether under New York law there is a 'plain, speedy and efficient' way for [the taxpayer] to press its constitutional claims while preserving the right to challenge the amount of tax due." *Tully v. Griffin, Inc.*, 429 U.S. 68, 74, 97 S.Ct. 219, 223, 50 L.Ed.2d 227 (1976). *See Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 512, 101 S.Ct. 1221, 1229, 67 L.Ed.2d 464 (1981) (quoting *Tully*). When the existence or adequacy of a state remedy is doubtful or uncertain, the state remedy is not plain, speedy or efficient, and the bar of the Act is lifted. *Rosewell*, 450 U.S. at 517, 101 S.Ct. at 1231 [Illinois tax refund procedure with full hearing and two year delay does not fall within statutory exception]; *Hillsborough Township v. Cromwell*, 326 U.S. 620, 626, 66 S.Ct. 445, 449, 90 L.Ed. 358 (1945) [taxpayers remedy found to be so uncertain as to make it speculative as to whether the state affords full protection to plaintiff's federal rights]. A state remedy is also inadequate where the state forum from which the taxpayer must seek redress cannot pass on constitutional questions. *Hillsborough, supra*, at 625, 66 S.Ct. at 449.

▌ In the case of Friarton, due to the City's successful and indefinite procedural

obstruction of plaintiffs' prosecution of their tax certiorari actions, there is uncertainty as to when, if ever, plaintiffs will be able to obtain a tax certiorari trial on the merits of their inequality and over-assessment claims. Confirming the inadequacy of the state remedy is the refusal or procedural inability of the New York Supreme Court to consider plaintiffs' defense of invalidity of the tax on the merits in *In Rem Foreclosure Action No. 29.*

I conclude that a constitutional violation exists here, and a "plain, speedy and efficient" state remedy is unavailable, thus justifying relief under the exception within the Act. To avoid the exception, a state remedy must "provide the taxpayer with a full hearing and judicial determination" at which the taxpayer may raise "any and all constitutional objections to the tax." *See Rosewell, supra,* 450 U.S. at 515 n.19, 101 S.Ct. at 1230 n.19. Furthermore, it appears that a majority of the *Rosewell* court would have found any delay longer than two years to be unacceptable and within the exception to the Act.[17]

Here, delays totalling seven years have already occurred. Most noteworthy is the blanket stay of all cases involving inequality claims, which was issued on application by the City without any notice to plaintiffs and without an opportunity to be heard. This stay extinguishes the only state remedy available to plaintiffs.

The City seems to argue that its "Settlement Offer" which it persists in urging to the Court, is sufficient in this case to obviate the clear deprivation of due process which results when the tax collector obtains a stay order without notice to this taxpayer, barring the trial of tax certiorari cases, and at the same time persists in foreclosing tax delinquent parcels. One asserting rights protected by the United States Constitution need not accede to a "settlement offer" as a condition to preserving his rights, especially where preservation of a property interest is contingent upon the waiver of claims and rights. *Cf. Rosewell, supra* at 508–518, 101 S.Ct. at 1226–1231. It may well be that an arrangement such as the City's proposed "Settlement Offer" which requires plaintiffs to pay their taxes, in the reduced amounts which their pleadings in the tax certiorari cases suggest are proper would be sufficient if a reasonably prompt subsequent trial were assured, and if such a procedure were not awarded "ad hoc" only to a taxpayer asserting federal claims, and then only contingent on a waiver, or settlement.[18]

For the foregoing reasons, the Court concludes that the action is not barred by the Tax Injunction Act, as the factual and procedural situation presented here is squarely within the exception in the Act.

## IV

Finding that the affirmative defenses pleaded lack merit, and that this action is not barred by the Tax Injunction Act, we then examine plaintiffs' entitlement to a preliminary injunction. To resolve this issue, we look to the rule of this Circuit as expressed in *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973):

---

**17.** Four Justices dissented in *Rosewell,* noting that the court had correctly assumed that the inequality of assessments involved created a clear federal constitutional violation (a point not questioned by the majority), but concluding that consistent over-assessments coupled with the two year delay, and the failure to pay interest on refunds, combined to render the state remedy deficient. At 529–543, 101 S.Ct. at 1236–1245. Justice Blackmun, a member of the five-man majority, suggested in his concurring opinion that the Illinois procedure qualified "perhaps only barely" under the Tax Injunction Act. At 529, 101 S.Ct. at 1237.

**18.** Where accomplished by legislation or uniform administrative regulations, those taxpayers claiming to be aggrieved by over-assessment may be required to pay first and sue later. *State Railroad Cases,* 92 U.S. 575, 23 L.Ed. 663 (1878). Expressed differently, "[t]he usual procedure for the recovery of debts is reversed in the field of taxation. Payment precedes defense." *Bull v. United States,* 295 U.S. 247, 259- 60, 55 S.Ct. 695, 699–700, 79 L.Ed. 1421 (1935).

"The settled rule is that a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." (Emphasis in original).

 Clearly plaintiffs satisfy the first half of the *Sonesta* test. Their complaint states a claim for deprivation of property without due process of law, by state action. Plaintiffs find themselves caught between Scylla and Charybdis, the rhetorical predecessors of a "rock and a hard place." They are convinced that their property is both over-assessed and unequally assessed. As to both of these points they seem to show a clear probability of success. Over-assessment may be inferred from the relationship between the assessment and the purchase price. Also, Exhibit A to the complaint shows that all the properties have sustained large operating losses since 1977, and that most parcels lost money prior to that time, making it impossible to pay the taxes as assessed. The taxes as assessed have reached as high as 59% of the aggregate *gross* revenues, as curtailed by applicable City rent regulations. The impact of these rent restrictions is shown in Exhibit B to the complaint; rents have been imposed as low as $38.00 per apartment.

Inequality of assessments seems not to be a matter of genuine dispute. As noted in fn. 14, it is a fact of life readily discernible to all but the assessor.[19] Hundreds of litigants await lifting of the *Freewalt* stay so that they may prove this notorious fact.

Plaintiffs also satisfy the second half of the *Sonesta* test, in that they are faced with possible irreparable injury. Because real property is unique a court of equity traditionally will regard a threatened loss of title and possession as constituting irreparable injury. Apart from this general pre-

cept, there are special circumstances in this case which warrant a finding of irreparable injury.

Plaintiffs assert imminent loss of their properties because the City is enforcing liens for taxes plaintiffs claim to be unlawfully exacted, while at the same time barring the door of the state courthouse to them, preventing trial of their tax certiorari cases, and preventing trial of the same issues as affirmative defenses or set-offs in the tax foreclosure action. While this Court urged the parties to settle their controversies (and even assigned a United States Magistrate to assist them in doing so, see *supra*, p. 1257), the failure of plaintiffs to accept an offer or proposed stipulation of settlement created *ad hoc* for this lawsuit does not remove the element of possible irreparable damage from the case.

Under that proposal, in order to obtain a trial on the merits of their assessment claims, plaintiffs must either waive their "inequality" claim trying only the "overassessment" claim, or agree to a "settlement offer" wherein they must pay a ransom in the form of "undisputed taxes" and waive several important rights including the right to press this civil rights action in this Court. Plaintiffs have the undoubted right to reject this unilateral settlement proposal, and have their right to a preliminary injunction determined on the facts and the law without regard to the City's proposal.

The state of the record before me is that all plaintiffs can do presently to retain their property is pay the entire amount alleged to be due immediately and hope that on some day in the future after *Freewalt* is resolved, they may be able to obtain a trial of their claims and get a refund if they prevail.

This is an inadequate, indeed an impossible remedy. No prudent person would pay seven, or even four years of tax arrears in such a vain hope. Value is often in the eye of the beholder; it will be possible, and indeed likely, that even after the *Freewalt*

19. *See generally, Hellerstein v. Assessor of the Town of Islip*, 37 N.Y.2d 1, 371 N.Y.S.2d 388, 332 N.E.2d 279 (1975).

impasse ends, Friarton could enjoy all due process to which it is entitled under the Constitution and still end up over-assessed. Unless the valid current assessment can be determined and the amount of the valid arrears adjudicated, Equity should not require further investment in these money losing properties as a condition to the right to litigate the tax issues before losing the land. Also, as a practical matter, no lender will finance the arrears unless these facts are known.

The Court finds possible irreparable damage under the facts of this case; and in our analysis we need not even reach nor consider plaintiffs' claims that the applicable rent regulations are unconstitutional as applied.

█ In an effort to argue based on balancing the equities, or perhaps merely to prejudice Friarton in the eyes of the Court, the City has characterized Friarton as a "Speculator." Perhaps it is. Any owner with rents such as these would have to be a speculator, or an altruist or a slumlord. The short answer to this is that even speculators are protected by the Constitution. The City also alleges that besides being land speculators, plaintiffs are "professional tax delinquents" who purchased these properties knowing that they are unprofitable and subject to tax arrears, intending to retain them at the least possible cost until they could be sold or developed at a substantial profit. (City's Memorandum of Law filed June 10, 1981 at 14). The largest parcel involved herein is two avenues away from the New York City Convention and Exhibition Center now under construction. The remaining parcels are on the West Side of midtown Manhattan, an area which is expected to be redeveloped in the near future because of new zoning regulations intended to encourage new construction there. The City further alleges that plaintiffs' real motivation behind this lawsuit is not to obtain a decrease in the assessed valuations of the properties, but to stall further the payment of *any* property taxes out of their pockets (something at which they have been successful for seven years),

while at the same time avoiding or deferring foreclosure. In commencing this action, we are told that plaintiffs "were buying a holding action against tax collection, [and] inviting the City to be their partners for all practical purposes in a speculative venture because land values might go up." (Tr. of Hearing, June 10, 1981, at 8). Plaintiffs deny these allegations. (Plaintiffs' Reply Memorandum filed June 15, 1981, at 8).

These allegations may well be true. It may also be true that the City in its anxiety *to effect an unfair forfeiture here and add* these tenements to its already swollen portfolio as a landlord of last resort in respect of abandoned or tax foreclosed properties, may not be totally free from speculative intent. Be that as it may. If the City is aggrieved it has an obvious remedy—it may correct the inequalities in its assessments, and it may provide Friarton with the "plain, speedy and efficient remedy" in state court to adjudicate its tax obligations which the Constitution requires. The equities here favor the plaintiffs, and strongly.

Before leaving the issue of possible irreparable damage, we note that a conveyance to the City now, followed by a reconveyance should plaintiffs prevail, will not be an adequate remedy. Such a change in control is likely to disrupt the rent collections, the tenants' services, and the tenancies themselves. Vesting of title in the City as a landlord of last resort seems likely to have an irremedial adverse effect on whatever value remains in these apartments.

The Court concludes that plaintiffs satisfy the *Sonesta* first standard, and are therefore entitled to a preliminary injunction.

V

█ We next consider the scope of the preliminary relief to be granted here. As noted, plaintiffs seek preliminary and permanent injunctions ordering the City not to take title to or possession of the properties. They also seek injunctive relief preventing the preparation, execution or recording of a deed conveying title to the properties to the City, that being the next step in the usual

tax enforcement procedures by action in rem. Implicit in these requests is an understanding that any such injunction would have to be vacated as soon as the City provides plaintiffs with a prompt trial of their tax certiorari claims on the merits. However, the parties apparently recognize that it would be improper and unprecedented for this Court to order the lifting of or an exemption to the stay of the entire inequality trial calendar of the state court obtained by the City in *Freewalt, ex parte* as to these plaintiffs. Nor is it practical for this Court to try plaintiffs' tax certiorari claims in this action, although we have the power to do so under the facts present here, as an incident to the adjudication of plaintiffs' federal Constitutional claims pleaded. Indeed, it would seem essential to adjudicate the property valuation in order to ascertain if there were in fact a taking or a deprivation of due process.

Were this Court to try such mixed issues of fact and law in this case:

> "state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency. Moreover, federal constitutional issues are likely to turn on questions of state tax law, which like issues of state regulatory law, are more properly heard in the state courts." *Perez v. Ledesma*, 401 U.S. 82, 128, n. 17 [91 S.Ct. 674, 698 n.17, 26 L.Ed.2d 790] (1971) (Brennan, J., concurring in part and dissenting in part), quoted in *Rosewell*, 450 U.S. at 527, 101 S.Ct. at 1236.

Plaintiffs' claims under the state tax law raise issues of state law as well as federal constitutional law. The state issues would have to be addressed first before reaching the federal Constitutional claims. Were this Court to do so, it would be brought directly to a resolution of the purportedly recondite issue of state law which has so confounded the state Supreme Court of New York County as to cause it to issue the blanket stay of all of its own inequality trials, rendered in *Freewalt.* That difficult issue may well be outcome determinative, and under *Erie* principles we would be bound to resolve it not as we think it should be resolved, but rather according to what we think the ultimate resolution of the issue by the New York Court of Appeals will be. In doing so, our expected likelihood of success would be no more than 50%. As the Supreme Court held in *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941): "In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication."

Accordingly, this Court deems it appropriate to exercise *Pullman*-type discretionary abstention with respect to the trial of the ultimate merits:

> "[W]hereby the federal courts, 'exercising a wise discretion,' restrain their authority because of a 'scrupulous regard for the rightful independence of state governments' and for the smooth working of the federal judiciary." *Pullman, supra* at 501, 61 S.Ct. at 645, *quoting Cavanaugh v. Looney*, 248 U.S. 453, 457, 39 S.Ct. 142, 143, 63 L.Ed. 354 (1919) and *DiGiovanni v. Camden Ins. Ass'n*, 296 U.S. 64, 73, 56 S.Ct. 1, 5, 80 L.Ed. 47 (1935).

The challenged state action in this case is susceptible of an interpretation or resolution by the state judiciary which would most likely avoid or modify the necessity of reaching the federal constitutional questions. *Kusper v. Pontikes*, 414 U.S. 51, 54, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973).

As in *Pullman*, however, this Court will retain jurisdiction pending the resolution of plaintiffs' state court tax certiorari actions. Jurisdiction will be retained in order to insure a just disposition of the litigation should anything prevent a reasonably prompt state court determination. *Kaiser Steel Corp. v. W. S. Ranch Co.*, 391 U.S. 593, 594, 88 S.Ct. 1753, 1754, 20 L.Ed.2d 835 (1968). This Court will reconsider its ab-

stention in this matter at any time on motion by any party for appropriate relief should the pending state court appeals in the unrelated cases in which the blanket stay of the inequality calendar was issued not be prosecuted and resolved with reasonable diligence, or should plaintiffs fail to proceed to trial when the "plain speedy and efficient" state remedy contemplated by the Tax Injunction Act is restored and the *Freewalt* stay, with its consequent denial of due process comes to an end, as it must.

## CONCLUSION

1. Defendants' motions to dismiss and/or for summary judgment are denied.

2. An order of abstention shall enter with respect to the merits, subject to being modified or terminated on motion made pursuant to such notice as the Court shall direct.

3. No discovery shall take place in this action except with leave of Court after notice.

4. Defendants and all others having notice are preliminarily enjoined from taking title to or possession of any of the plaintiffs' properties described in the Complaint or from causing a deed or deeds conveying any of those properties to be executed, delivered or recorded, pending trial of this action.

While this injunction is effective immediately, this Court directs that a formal injunction order shall be settled on ten (10) days notice of settlement, or on waiver of notice, if counsel can agree upon its form. Such injunction order shall contain such reasonable provisions which will balance the equities as the parties may propose to the Court on settlement of the order, and shall also provide that:

(a) The preliminary injunction may be dissolved on notice in the event that:
(i) Plaintiffs neglect or fail to go to trial on their tax certiorari cases when and if permitted to do so; or
(ii) Plaintiffs fail to pay within sixty (60) days after entry of a state court judgment, taxes and penalties as found due following the adjudication of the tax certiorari cases, with respect to any fiscal year comprised within the pleadings in *In Rem Foreclosure No. 29* ; or
(iii) Any other change in fact or law occurs after the date hereof and renders continued injunctive relief inequitable or unnecessary.

(b) As a condition of the injunction, plaintiffs shall deposit *all* rents and operating income from the properties received on or after the date hereof with a qualified and experienced nonparty receiver, to be selected by agreement by the parties. Such agreement if reached shall not constitute a waiver or acquiescence. If the parties cannot agree as to the name of the receiver within twenty (20) days hereof (which they are respectfully urged to do) any party may move for this Court to select the receiver. The receiver shall use the funds so collected to pay all reasonable and necessary operating costs of the properties, including current sewer and water charges, with special attention being given to providing *all* essential and customary services to the tenants residing on the premises. The receiver shall not, unless consented to by the parties, make any mortgage payments, either principal or interest, nor pay current property taxes. Should the receiver have any excess monies they shall be deposited in an interest bearing account or certificate. At the conclusion of this action, or at such time as this injunction is vacated by this Court, the receiver shall be required to account to all parties. A suitable bond shall be provided unless waived.

The foregoing constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 65, F.R.Civ.P. Counsel shall settle an injunction order on notice.

So Ordered.